## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LISA MONTGOMERY
Federal Medical Center Carswell
3000 I Street
Fort Worth, TX 76127,

            Plaintiff,

v.

No. 20-cv-_____

WILLIAM P. BARR
Attorney General of the United States
in his official capacity
950 Pennsylvania Avenue, NW
Washington, DC 20530,

FEDERAL BUREAU OF PRISONS
320 First St., NW
Washington, DC 20534,

MICHAEL CARVAJAL
Director, Federal Bureau of Prisons
in his official capacity
320 First St., NW
Washington, DC 20534,

MICHAEL CARR
Warden, Federal Medical Center Carswell
in his official capacity
3000 I Street
Fort Worth, TX 76127,

T.J. WATSON
Warden, Federal Correctional
Complex Terre Haute
In his official capacity
4700 Bureau Road South
Terre Haute, IN 47802,

ALIX M. McLEAREN
National Administrator of Women
  and Special Populations

Federal Bureau of Prisons
in her official capacity
320 First Street, NW
Washington, DC 20534,

          Defendants.

## COMPLAINT
(for declaratory and injunctive relief—conditions of confinement)

### INTRODUCTION

1.      Lisa Montgomery ("Lisa" or "Mrs. Montgomery") is a federal prisoner currently housed at Federal Medical Center ("FMC") Carswell in Fort Worth, Texas. The government plans to execute her on December 8, 2020.

2.      Beginning in her early childhood, Mrs. Montgomery has endured severe trauma, repeated sexual and physical abuse, and neglect. These harrowing experiences, combined with congenital brain damage and multiple traumatic brain injuries, have resulted in incurable and significant psychiatric disabilities. One acute manifestation of Mrs. Montgomery's condition is extreme emotional distress, terror, and physiological stress reactions such as hives when in the presence of men, particularly strangers.

3.      The conditions of confinement the government has instituted since issuing Mrs. Montgomery's death warrant and its plans to transfer her to a men's prison in advance of her execution date, without adequate regard for her gender or her disabilities, are unconstitutional and violate federal disability rights law.

4.      Mrs. Montgomery's profound trauma began during her childhood, when she was first raped by her stepfather, who eventually built a special room to isolate and rape her, and then gang-raped by her stepfather's friends. Her mother, far from protecting Lisa, threatened, abused,

2

and beat her, and forced her into prostitution. This sexual violence continued when, as a teen, Lisa was coerced into marrying the adult son of her mother's boyfriend, who then sexually tortured and raped her.

5.    Decades of rapes, beatings, and sexual torture have taken a devastating toll. Mrs. Montgomery has documented brain damage, experiences temporal lobe seizures, and has been diagnosed with Bipolar Disorder and Complex Post Traumatic Stress Disorder ("Complex PTSD"). She dissociates regularly, involuntarily detaching from her circumstances, and struggles to know what is real and what is not. She endures hallucinations, psychosis, mania and depression, affecting every aspect of her daily life. To treat her episodes of florid psychosis and mitigate the debilitating symptoms of her other psychiatric disabilities, FMC Carswell personnel administer her anti-psychotic, anti-epileptic, and anti-depressant medications. Even with these treatments, Mrs. Montgomery continues to experience severe, distressing, and near-constant symptoms.

6.    On Friday, October 16, 2020, Defendant Michael Carr ("Carr"), Warden of FMC Carswell, gave written notice from Defendant T.J. Watson ("Watson") to Mrs. Montgomery. The notice informed Mrs. Montgomery that the government intends to execute her on December 8, 2020. Mrs. Montgomery was later informed through counsel that the government intends to execute her at the United States Penitentiary ("USP") Terre Haute, an all-male prison in Terre Haute, Indiana.

7.    Defendants moved Mrs. Montgomery into uniquely harsh detention conditions immediately following their notice on October 16. Defendants (and/or their agents and subordinates) deprived her of all of her belongings, including books, legal papers, and photographs of her children. Defendants also transferred her to a cold, single cell with constant

3

bright lights. Male guards now observe Mrs. Montgomery while she uses the toilet in the new cell. Instead of permitting her to retain her usual clothing, they forced her to wear a loose-fitting gown with Velcro straps and took away her underwear, bra, and socks. After some days and numerous requests, Defendants provided Mrs. Montgomery with a crayon, a single sheet of paper at a time, and socks. With an instruction to Mrs. Montgomery to "be a good girl, now," Defendants also provided her a pair of mesh underwear.

8.      These conditions – far harsher than the conditions for men with pending execution dates and harsher than suicide watch conditions at FMC Carswell – would be cruel for any prisoner. But for Mrs. Montgomery, the conditions amount to torture. As Defendants know, these conditions reinforce her sexual trauma and significantly aggravate her severe mental illness. Defendants have taken no steps to avoid these consequences and have provided no modifications or accommodations to account for the particular harm caused by their policies and practices in light of Mrs. Montgomery's disabilities and gender. Transfer to an all-male prison will inflict further gratuitous suffering on Mrs. Montgomery and will likely trigger a catastrophic psychiatric breakdown.

9.      Mrs. Montgomery brings this lawsuit under the Eighth Amendment to the Constitution, the Rehabilitation Act, and the Administrative Procedure Act, seeking declaratory and injunctive relief from these cruel, unusual, and discriminatory conditions of confinement, whether at FMC Carswell or at USP Terre Haute.

## PARTIES

10.      Plaintiff Lisa Montgomery is a U.S. citizen currently in the custody of the Federal Bureau of Prisons ("BOP"), an agency of the United States Department of Justice ("DOJ"). She is confined at FMC Carswell under sentence of death, and is scheduled to be executed on

December 8, 2020. Mrs. Montgomery is a person with disabilities for purposes of Section 504 of the Rehabilitation Act.

11.     Defendant William P. Barr ("Barr") is the Attorney General of the United States. Mrs. Montgomery was remanded to the custody of the Attorney General upon her conviction and imposition of her death sentence. The Attorney General is the executive responsible for carrying out death sentences against federal prisoners. Defendant Barr is sued in his official capacity.

12.     Defendant Federal Bureau of Prisons ("BOP" or the "Bureau") is the executive agency responsible for the management and regulation of all federal penal and correctional institutions, including USP Terre Haute and FMC Carswell. The Bureau of Prisons is headquartered in Washington, D.C.

13.     Defendant Michael Carvajal ("Carvajal") is the Director of the Federal Bureau of Prisons. He is responsible for the supervision and operation of all federal prisons, including USP Terre Haute, where Defendants intend to execute Mrs. Montgomery, and FMC Carswell, where she is currently incarcerated. Defendant Carvajal is sued in his official capacity.

14.     Defendant Michael Carr is the warden of FMC Carswell. He is sued in his official capacity.

15.     Defendant T.J. Watson is the warden of USP Terre Haute. He is sued in his official capacity.

16.     Defendant Alix M. McLearen ("McLearan") is the National Administrator of Women and Special Populations Branch for the Federal Bureau of Prisons. She is sued in her official capacity.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States. Mrs. Montgomery seeks prospective injunctive relief under the Eighth Amendment to the Constitution, Section 504 of the Rehabilitation Act of 1973, and the Administrative Procedure Act, as well as declaratory relief under 28 U.S.C. § 2201(1) and 28 U.S.C. § 2202.

18.     Venue is proper in this District under 28 U.S.C. § 1391(e) because Defendants Barr, Carvajal, and McLearen are officers of the United States acting in their official capacities who reside in this District, and the BOP is an agency of the United States.

## STATEMENT OF FACTS

### Sexual Violence, Trauma, Brain Damage, and Mental Illness

19.     Lisa Montgomery's disabilities and brain damage began before she was born. Her mother Judy was an alcoholic who drank during pregnancy, causing Lisa to be born with permanent brain damage. Lisa's mother's parenting was an exercise in cruelty, neglect, and ultimately, torture. When Lisa did not finish her meal, Judy would leave her strapped into her high chair for hours, crying. If Lisa wet the bed, Judy forced her to take cold showers as punishment. When Judy grew angry with Lisa, she would beat her with belts, cords, hangers, and hairbrushes. Lisa was not allowed to speak or make any noise—even the noise of a fork on a plate would trigger her mother's rage. Often Judy duct-taped Lisa's mouth shut to force her into silence. Lisa learned not to cry when the duct tape was on her mouth, because her nose would become stuffed up and she feared she would suffocate.

20.     Lisa's older sister Diane tried to protect her, but Diane was a child herself—and she was also a victim of severe abuse, including rape. When Diane was about eight years old,

6

one of Judy's male friends began regularly molesting and raping her. The male friend entered Diane's room at night while she lay next to four-year-old Lisa in a bed close enough that the girls could reach out and touch each other's hands. When Diane was removed from the home by social services, the government agency failed to remove Lisa from the home or make any inquiries into her well-being.

21.     Lisa's father abandoned his family when Lisa was three years old. Judy remarried Jack Kleiner, an alcoholic who beat his wife and children mercilessly. According to one of his children, "[w]hen Jack came into a room, the atmosphere changed." He broke Judy's jaw and knocked out her teeth. He punched, kicked, and choked Lisa.

22.     Jack Kleiner's abuse of Lisa took on sexual overtones starting when Lisa was still a small child. He would make Lisa go into the bathroom, take her pants down and bend over the tub for beatings. By the time Lisa turned 13, Jack started raping her. He threatened to rape Lisa's little sister if she resisted, and told her he would kill her entire family if she told anyone.

23.     During these years, the family moved repeatedly. In the first fourteen years of her life, Lisa moved seventeen times. Jack eventually moved the family to an isolated, run-down trailer at the dead end of a road. It had no running water. Jack built Lisa a small room onto one side of the trailer. Lisa's small room had its own entrance from the outside, making it easy for Jack to isolate and rape Lisa out of earshot of others. Although still a child, Lisa began to drink the wine stored in the room as a means to cope. Lisa lived in constant terror and anticipation of rape. Over a period of three years, her stepfather raped her two to three times a week.

24.     Jack was not the only one raping Lisa, and not the only family member involved in her rapes. When Lisa was about 15 years old, her mother began selling her for sex in exchange for utilities and other favors and services. Judy would banish the other children from

7

the trailer so that the plumber, the electrician, and the man who delivered propane gas could rape Lisa in private. Judy told Lisa she had to "pay" for her "own room" – the rape cabin Lisa's stepfather built – by submitting to the men. At about this time, Jack was also inviting his friends to the home to rape Lisa. Several men, for several hours at a time, one after the other, raped Lisa, penetrating her anus, her mouth, and her vagina. When the assaults finished, the men urinated on her Lisa she was trash.

25.   To survive these attacks, Lisa would dissociate mentally, attempting to escape from her hellish reality. Much later, experts concluded that this was the beginning of Lisa's dissociative disorder, a mental illness that severs her connection with reality. She also developed Complex PTSD from the prolonged torture. She withdrew and became quiet, trying to make herself invisible.

26.   The state of Oklahoma consistently failed to take steps to investigate Lisa's abuse and protect her from future violence. Although social services removed her sister Diane from the home when Lisa was a small child, the agency failed to remove Lisa from the home or inquire into her well-being. Lisa reported the rapes to a trusted adult, her cousin David Kidwell, a police officer. But he failed to report the crimes or to intervene. Mr. Kidwell stated in an affidavit that Lisa was crying and shaking as she described the rapes.

27.   Lisa's mother reported Jack's rapes of Lisa only after the fact – when seeking a divorce. She took Lisa to see a local physician after she "discovered" Jack raping Lisa. Years later, the doctor still recalled the visit, and how infuriated he became once he learned more about the circumstances for the visit. Judy reported the rape to the Sperry, Oklahoma Child Welfare Office, which took no further action after noting that Judy had filed for divorce. When Judy

8

eventually divorced Jack in 1985, she testified in her divorce proceedings that she saw him raping Lisa: "He was in her. He was pumping her."

28.     Unprotected by adults or any government institution, Lisa survived through involuntary coping mechanisms – retreating into her own world in her mind. Occasionally, she would enjoy her violin or play with her childhood dog. But Lisa's mother, Judy, soon took these simple joys from her, too: she took Lisa's violin away and sold it. Judy killed the family dog (as a punishment for some unknown infraction by Lisa's brother), brutally smashing the dog's head with a shovel until its brains came out.

29.     Lisa also suffered multiple head injuries in her early developmental years at the hands of her mother, stepfather, and stepbrother. Lisa's mother and stepfather slapped, shook, and hit her frequently. When Lisa was a teenager, her stepfather hit her head against the concrete floor while he raped her. One of her stepbrothers threw a heavy battery at Lisa and injured her in the back of her head.

30.     When Lisa was in high school, her mother became involved with a new boyfriend, Richard Boman ("Boman"). While Judy spent time with him, she delegated domestic chores to Lisa, who cared for her younger siblings, cooked and cleaned. Lisa made plans to escape, signing up for the Air Force and preparing to enlist immediately after high school graduation. But when Boman's twenty-four-year-old son, Carl, came home from the Army, Judy and Boman coerced Lisa into marrying Carl, even though she was a minor and Carl was much older and effectively her stepbrother. Lisa quickly became pregnant and lost her chance to enlist and to free herself from her traumatic environs.

31.     By the eve of her eighteenth birthday, Lisa had experienced nine out of the ten adverse childhood experiences that can lead to trauma, an astonishing amount of trauma for a

single person to absorb. The trauma impaired her functioning in every sphere of her existence. Things that humans need to develop and grow were impossible for Lisa to acquire in the home where she was raised. Regulating her feelings, planning, thinking through her actions, and controlling her impulses were difficult for her at the best of times, and nearly impossible under additional stress. Doctors noted decades later that the damage was visually apparent, encoded in Lisa's anatomy. Scans revealed an absence of brain matter, proving that her brain had either deteriorated after an injury or never formed properly.

32.     Lisa's upbringing stripped her of any autonomy and sense of self. She had been raised in captivity, deprived of any control over her body and mind, and placed at the mercy of people who tortured her, sexually, physically, and emotionally. She learned to survive by doing what her captors demanded. Her captivity induced enduring personality changes as an adaptation to catastrophic levels of stress. Lisa developed Complex PTSD. With this disorder, she continues to re-experience her torture as if it were actually occurring at the present moment. The feeling of always living under threat overwhelms her senses. As one mental health expert observed, "[t]here [was] no ground for her to stand on."

33.     Violence dogged Lisa in all her relationships. Carl Broman, her stepbrother and first husband, controlled everything in Lisa's life, and raped and brutalized her. In one incident, Carl shoved Lisa, who was naked and getting out of a shower, against a wall heater that burned her flesh while he raped her. Carl's behavior only became more violent during their marriage. He beat her, tied her in stress positions, poured hot wax on her, forcibly inserted glass bottles in her anus and vagina, held a knife to her throat, and raped her. Lisa was ashamed, humiliated, and fearful. She grew to expect the violence and lived in sickening anticipation of its reoccurrence. As she had learned when raped as a young child, during the rapes Lisa would dissociate and

10

escape mentally. Years later, Lisa's brother Teddy Kleiner accidentally discovered a home video showing Carl beating her and raping her. Teddy described it "like a scene out of a horror video. My sister was crying and in pain."

34. Lisa gave birth to Carl's four children in less than five years. After her fourth child was born, Judy (Lisa's mother) and Carl forced Lisa to be sterilized.

35. After the birth of her children, Lisa's mental health deteriorated even further. Her psychotic symptoms intensified. She descended into a near constant state of dissociation and depersonalization. She describes feeling like "I'm not in my body. I'm not real," and that "the world feel[s] like a movie or a fog or a dream." She also experienced the full onset of Bipolar Disorder after the birth of her four children. Her moods became erratic and swung dramatically. She experienced rapidly shifting feelings of irritability, agitation, and depression, sometimes all at the same time. Her post-traumatic stress disorder exacerbated her symptoms of Bipolar Disorder. These complex layered disabilities and impairments made it difficult for her to concentrate and left her feeling confused by the world around her.

36. Entering adulthood, Mrs. Montgomery increasingly turned to alcohol. By the time she was in her twenties, she was often drunk. She stopped taking care of her personal appearance and hygiene to such an extreme that people could not stand to be around her. She had lice for five years, seemingly unaware or indifferent. Mrs. Montgomery was not able to keep up with the day-to-day tasks of parenting. The children went to the neighbors for food and baths. Mrs. Montgomery had spiraled so far down into her mental illness that she could only be brought back to reality if the children called her "Martha." Removing lice from her children's hair so overwhelmed Mrs. Montgomery that instead of addressing it, she withdrew them from school.

37.     The crime for which Mrs. Montgomery was convicted and sentenced to death
reflects the depth of her mental illness, despair, and disconnect from reality. The crime also
occurred against the backdrop of yet more changes in her family setting. Mrs. Montgomery and
Carl had divorced, and Carl was fighting for custody of their children. Meanwhile, Mrs.
Montgomery had remarried, to Kevin Montgomery.

38.     The facts of the crime are grim. It took place two days after Carl officially filed
for custody of their children, and after Mrs. Montgomery told her new husband she believed she
was pregnant (which was impossible, because she had been sterilized against her will). Carl had
learned that Mrs. Montgomery told her new husband she was pregnant, and he threatened to
expose her lie in court to obtain custody of her children. The threat of losing her children,
combined with years of trauma and severe mental illness, pushed Mrs. Montgomery over the
brink. She went to the home of Bobbie Jo Stinnett, who was eight months pregnant. Mrs.
Montgomery killed her, delivered her baby girl by cutting her from her mother's abdomen, and
took the baby home and cared for her, believing she was Mrs. Montgomery's own child.

39.     All experts—even those called by the prosecution at trial—agreed that Mrs.
Montgomery was suffering from severe mental illness at the time of the crime. Yet at the time of
the crime, and throughout decades of torture, she received no mental health treatment and no
regular medical care. By her mid-twenties, Mrs. Montgomery was emotionally, physically,
neurologically and psychologically broken. The years of constant abuse, combined with her
congenital brain damage, deprived Mrs. Montgomery of the most basic conditions required for
normal human functioning.

40.     Brain imaging and testing show Mrs. Montgomery's brain's networks to be
severely damaged. A neurologist compared her brain to a city that has been bombed in multiple

areas, where functioning across the entire city is affected. Her pattern of brain deficits is consistent with epilepsy, frontal lobe syndrome, and parietal and temporal lobe dysfunction. Each of these neurological impairments has profound practical impacts. In lay terms, for example, the parietal lobe synthesizes information and stimuli and helps a person decipher what is good or bad for her. Mrs. Montgomery's head injuries and seizures are another risk factor for psychological impairments.

41.    In addition to brain damage, Mrs. Montgomery has developed significant psychological impairments and psychiatric conditions that are well-documented in her prison medical records. She has multiple, serious mental health diagnoses: Complex PTSD, Bipolar Disorder with psychotic features, Major Depression, and Temporal Lobe Epilepsy. Mrs. Montgomery's Complex PTSD can be expected to aggravate the symptoms of her Bipolar and Depressive Disorders. She experiences depressed thinking, mood instability, behavioral dysregulation, anxiety, shame, fear, paranoia, hallucinations, and dissociation. She has auditory hallucinations that her mother is talking to her, saying cruel things, and experiences olfactory hallucinations of a "bad smell" that others cannot detect. Mrs. Montgomery becomes easily overwhelmed, and is erratic and unable to manage her emotions. She has a disturbed sense of self, and distorted interpersonal relationships as a result of her childhood experience of relationships as threatening and unstable. Mrs. Montgomery re-experiences intrusive images of her stepfather's rapes with hyperarousal symptoms of heart racing, fear, and gagging. In any given moment, she may once again endure the same smells, sensations, and physiological responses that she survived when raped repeatedly as a child and young woman.

42.    Dissociation remains by far Mrs. Montgomery's most prominent symptom. Dissociation disconnects thoughts, memories, surroundings, and identity. People with

dissociative disorders escape reality in ways that are involuntary and unhealthy and cause problems with functioning in everyday life. Dr. Katherine Porterfield, a psychologist who works regularly with trauma victims, describes Mrs. Montgomery's dissociative disorder as one of the most severe cases she has ever seen. Mrs. Montgomery could not—and cannot—tell what is real. She has confused thought processes and thinking, and disengages from the present. Her own perceptions of her body slip away from her. She is unable to recognize the world around her as real, and has repeatedly lost contact with reality. At its most severe phase, dissociation will rupture the link between consciousness and awareness. Significant stress is recognized as one way individuals with dissociative disorder can be pushed to this breaking point.

43.      Dissociative Disorder, Bipolar Disorder, Temporal Lobe Epilepsy, traumatic brain injuries, and brain damage from in utero alcohol exposure are not curable. Treatment can help individuals more successfully navigate daily living, including treatment with medication, psychotherapy, and coping skills. For Lisa Montgomery, treatment with a host of antipsychotic, antidepressant and seizure medications, as well as psychotherapy and development of coping skills like crafts and reading, have only partially controlled her most serious symptoms like psychosis. Prison doctors treat Mrs. Montgomery with a host of anti-psychotic and anti-depressant medications, including Risperdal, Depakote, Bupropion, Wellbutrin, Zoloft, Elavil, and Lithium. Nonetheless, she has attempted suicide multiple times, including in 2010, 2011, and 2012, with overdoses of aspirin or Tylenol. Mrs. Montgomery has been periodically suicidal in recent years. She continues to experience dissociative symptoms, even while on a complex cocktail of medication. With increased stress, her always tenuous link to reality is even more susceptible to rupture.

14

**Current conditions of confinement at FMC Carswell**

44.    Mrs. Montgomery's death warrant was issued on October 16, 2020, setting her date of execution for December 8, 2020. She was notified of the death warrant on the date of its issuance and placed on death watch and suicide watch at that time.

45.    Mrs. Montgomery was transferred to a new single cell. The fixtures in her single cell include a toilet/sink combination unit, a cement bunk, and a rubber mattress. She was also placed under new conditions of confinement that are harsher than the conditions for men housed at USP Terre Haute under death watch. Defendants have not forced condemned men to experience anything like Mrs. Montgomery's current conditions of confinement. Ten male federal prisoners have been executed since 1974, seven in the summer and fall of 2020. All of these men were incarcerated and executed at USP Terre Haute.

46.    Defendants force Mrs. Montgomery to wear a tear-resistant "safety smock." From October 16 to October 30, 2020, Defendants did not permit her to have any undergarments, either brassiere or underpants to wear under her smock. The smock has flexible and unsecure Velcro closures that open when Mrs. Montgomery squats or crouches, leaving her breasts, pubic area, and genitalia exposed when she does not have underwear. Mrs. Montgomery could barely sleep without undergarments because she felt exposed and vulnerable. None of the men under execution watch at USP Terre Haute were forced to wear safety smocks or deprived of underwear.

47.    Mrs. Montgomery was afforded greater dignity when previously placed on suicide watch at FMC Carswell. While she was monitored, it was never through 24-hour video surveillance, and she was permitted a privacy shield so she could use the toilet without being

15

fully exposed to those monitoring her cell. The men at USP Terre Haute were provided with privacy shields while on death watch.

48.     Mrs. Montgomery knows that both male and female guards monitor her on the video feed because it runs to the guards' office used by men and women and, after she had used the toilet in her cell, a male guard commented through the window to her cell, "so you had to go tinkle today, huh?" For the first time, since Mrs. Montgomery's warrant was issued, defendants have informed her that male guards can watch her using the toilet in her cell.

49.     After fourteen days with no undergarments, on October 30, 2020, Defendants gave Mrs. Montgomery mesh underwear.

50.     When Defendants gave her the underwear, which she had been requesting unsuccessfully every day for two weeks, staff instructed her to "be a good girl, now." As a survivor of repeated rapes, Mrs. Montgomery was reminded of the warning language often used by her mother as she forced young Lisa to have sex with strange men. None of the men at USP Terre Haute under death watch were instructed that having underwear was contingent on their good behavior.

51.     From October 16, 2020 to November 1, 2020, Defendants did not allow Mrs. Montgomery to have any shoes or socks while in her cell, and only shower shoes when outside her cell. Her feet are cold on the concrete floor without shoes and socks. On November 1, Defendants permitted Mrs. Montgomery to have socks but not shoes inside her cell.

52.     Defendants provide Mrs. Montgomery with two tear-resistant blankets. The blankets are Mrs. Montgomery's only protection from the cold in her cell. She keeps them wrapped around her body as much as possible.

16

53. Defendants provide Mrs. Montgomery only the following hygiene products: four squares of toilet paper for each bathroom use and, as of October 22, 2020, a silicone finger toothbrush to use twice per day.

54. Defendants permit Mrs. Montgomery to take cold showers three times a week, during which she is constantly monitored by staff. The cold showers remind her of one of her abusive mother's treatments: holding her roughly under cold water as punishment. None of the men under death watch at USP Terra Haute were denied the opportunity for appropriate hygiene and bathing.

55. From October 16 to October 23, 2020, Mrs. Montgomery was not allowed to have any reading material. Since October 23, Defendants have allowed Mrs. Montgomery to have *one* paperback book. She has been denied all other reading material and personal items. Defendants have not allowed her to have legal materials, writing paper, pens or pencils, craft items, or photos of her children. None of the men under death watch at USP Terra Haute had their legal or written materials removed.

56. Writing, crafting, and reading are among the coping strategies that Mrs. Montgomery uses to reduce the distressing symptoms of her disability. Defendants are depriving her almost completely of these accommodations. Defendants have made no assessment of whether providing these materials would pose a risk, instead arbitrarily depriving Mrs. Montgomery of key support tools at a critical moment.

57. Defendants leave lights on in her cell 24 hours a day, disrupting Mrs. Montgomery's sleep. Sleep deprivation is widely known to lead to fairly rapid deterioration in an individual's cognitive and emotional functioning. Defendants have made no effort to determine whether leaving the lights on is necessary to protect Mrs. Montgomery's safety or the safety of

17

others, instead arbitrarily imposing this distressing and punitive environment without regard for its impact on her mental health or other harms. The lights were not left on for 24 hours a day for the men under death watch at USP Terre Haute.

58.    Defendants, including male guards, constantly surveil and monitor Mrs. Montgomery in her cell by video camera. Guards watch everything she does in her cell, including sleeping and using the toilet. At least one male guard told Mrs. Montgomery that he had seen her urinating. This exposure is even more traumatic, humiliating, and frightening for someone with Mrs. Montgomery's history of rape and sexual abuse. Despite knowing of Mrs. Montgomery's complex disabilities, Defendants have taken no steps to determine whether female guards could be assigned to surveil Mrs. Montgomery, or whether any other modifications could be made to mitigate the harm caused by allowing male guards to monitor female prisoners.

59.    Defendants deny Mrs. Montgomery access to outdoor exercise and fresh air. The men at USP Terre Haute under death watch had regular access to outdoor exercise.

60.    Defendants deny Mrs. Montgomery access to her prescription eyeglasses, which she needs in order to see clearly, and her CPAP machine, which physicians prescribed for her sleep apnea.

61.    Defendants had a male staff member use a lubricant to forcibly and painfully remove Mrs. Montgomery's wedding ring from her hand. (After her first, abusive, marriage, Mrs. Montgomery remarried and remains married to Kevin Montgomery.) Her ring has not been returned. The removal and deprivation of Mrs. Montgomery's wedding band was degrading, humiliating and physically painful. It is the symbol of a Christian marriage, and the sanctity of her marriage in her Christian faith is a key part of Mrs. Montgomery's fragile emotional stability.

18

**Aggravation of mental illness and infliction of gratuitous pain and suffering**

62.     With these conditions, Defendants have exacerbated Mrs. Montgomery's severe mental illness, inflicted gratuitous pain and suffering, and subjected her to a substantial risk of serious harm.

63.     Being confined in a constantly illuminated room in an ill-fitting smock without undergarments while being constantly surveilled by male guards parallels the conditions under which Mrs. Montgomery was kept in a special room and raped by multiple men as a child. The continual reminders of her past sexual torment are likely to trigger her learned fear arousal and threat detection systems, including psychotic levels of dissociation.

64.     Defendant's denial of basic human needs like hygiene products and clothing, forcing Mrs. Montgomery to affirmatively request them, mirrors the coercive control her mother and stepfather exercised over her when she was a child. The resulting feeling of helplessness will only further compromise Mrs. Montgomery's functioning.

65.     These conditions will destabilize Mrs. Montgomery's mental health and exacerbate her complex and significant psychiatric and neurological conditions. Defendants have imposed these conditions arbitrarily and have failed to determine what reasonable accommodations could be implemented to avoid or limit the impact on Mrs. Montgomery's disabilities.

**Transfer to Terre Haute will further aggravate Mrs. Montgomery's severe mental illness, inflict gratuitous pain and suffering, and violate BOP's own policies**

66.     Defendants' pending transfer of Mrs. Montgomery to USP Terre Haute will exacerbate her severe mental illness, inflict gratuitous pain and suffering, and subject her to a substantial risk of serious harm.

67.     FMC Carswell is "an administrative security federal medical center with an adjacent minimum-security satellite camp," housing 1,066 women "of all security levels with special medical and mental health needs" in the medical center and 239 women at the camp.

68.     FMC Carswell is the only medical facility for women in the Federal Bureau of Prisons.

69.     In contrast, USP Terre Haute is an all-male prison, housing approximately 1241 high-security prisoners, with an adjacent all-male prison camp housing approximately 198 minimum-security prisoners. No female prisoners have ever been housed at USP Terre Haute.

70.     Hundreds of male guards work at USP Terre Haute. Male prisoners and staff perform the work of the prison, like preparing meals, cleaning the prison facilities, and laundry. Defendants' planned transfer of Mrs. Montgomery will mean she will be watched over by a work force that is predominantly male and that has little or no experience working with female prisoners.

71.     Defendants are aware of the special risks posed by guards supervising women with trauma histories without appropriate training. On November 23, 2016, Defendant BOP adopted the Female Offender Manual ("Manual") with the purpose of ensuring that the Bureau's activities are "gender-responsive, culturally sensitive and address the unique needs of incarcerated females at facilities that house female offenders." The Manual specifies that gender-responsive approaches are "based on an understanding of the ways females are different from men," and "trauma-informed approaches recognize the experiences and outcomes of all types of trauma and take steps to address them through policy and programs." A 2018 Report of the Office of the Inspector General, Review of the Federal Bureau of Prisons' Management of Its Female Inmate Population, noted BOP developed the Manual based in part of studies that show

that "as many as 90 percent of women in prison have experienced trauma and that the most common type of traumatic experience for female inmates is repeated sexual violence, followed by intimate partner violence." Based on this trauma, BOP recognizes the need for policies and training to ensure the psychological and emotional safety of prisoners.

72.      The Manual requires that "[a]ll staff at institutions or complexes housing female offenders are required to complete training developed by the Female Offender Branch and the trauma-informed correctional care module." It recognizes the special need for training and services for "female satellite facilities attached to male institutions." A host of regulations require that female prisoners be searched only by female BOP employees. *See* 28 C.F.R. § 552.11(c); BOP Program Statement 5521.06, Searches of Housing Units, Inmates, and Inmate Work Areas, 4 (June 4, 2015). *See also* 28 C.F.R. § 115.15(a); 28 C.F.R. § 115.15(b); BOP Program Statement 5521.06, 3; BOP Program Statement 5324.12, Sexually Abusive Behavior Prevention and Intervention Program, 17 (June 4, 2015).

73.      The Manual spells out that high-security female prisoners may be housed in administrative units like the FMC Carswell unit, but that they must receive "mental health screening." The Manual states the BOP's policy that if "an inmate's mental health appears to have deteriorated during placement in the administrative unit, the institution's Chief Psychologist works with the Female Offender Branch and Psychologist Services Branch to mitigate the impact or to identify an alternative placement."

74.      On November 1, 2020, Mrs. Montgomery's counsel submitted 24 detailed questions to counsel for Defendant BOP, asking about the bases for detaining Mrs. Montgomery under her current conditions, the transfer protocols for moving Mrs. Montgomery to USP Terre Haute, and the expected conditions at USP Terre Haute. Mrs. Montgomery's counsel inquired

21

about the gender makeup of the transport team, and whether any of the individuals involved in transporting Mrs. Montgomery had any training in gender responsive, trauma-informed correctional practices for the transportation. In light of the urgency of the impending execution date, counsel requested a response by Wednesday, November 4, 2020. Defendants provided no response by November 4. On November 6, 2020, Defendants declined to answer any questions regarding the transportation of Mrs. Montgomery. Defendants stated only the general policy of BOP that women in the custody of BOP shall be supervised in accordance with the Female Offender Manual. Defendants have not confirmed that any of the transport staff or USP Terre Haute staff involved in supervising Mrs. Montgomery will have had the training required by BOP policy.

75. Federal regulations require the Director of the BOP to specifically designate the BOP facility at which federal executions shall be carried out. 28 CFR § 26.3. In 1993, the Director of the BOP designated USP Terre Haute. At that time, there were no women on death row. The BOP has adopted an "Execution Manual" to govern federal executions. The Execution Manual states that it is the policy of the BOP that the execution will be carried out in a "humane manner." Even though USP Terre Haute is an all-male facility, defendants have not specifically designated any prison as the location where women facing the death penalty shall be executed.

76. At USP Terre Haute, Mrs. Montgomery will be required to interact with a large number of armed guards, likely male. Whenever prisoners on death row are moved outside their cells, they are handcuffed and shackled in leg irons and a waist chain, and are accompanied by multiple armed guards. For each of the executions this summer and fall, an all-male escort team of heavily armed guards transported the death-sentenced prisoner from his cell into a vehicle, and then into another building in which the execution takes place (the "Death House"). Hundreds

of additional BOP and law enforcement personnel, including many in full body armor with military-style weapons, patrolled the grounds of USP Terre Haute on the day of the execution and in the days before. In addition to the escort team, heavily armed male guards line the hallways in the prison and in the Death House when a prisoner on death watch is moved.

77.     While Mrs. Montgomery's armed escorts at FMC Carswell have included at least some women, the armed guards that have transported death row prisoners at USP Terre Haute have been all male, dressed in body armor and helmets, and carrying military weapons.

78.     The transfer of Mrs. Montgomery to an all-male prison with supervision by male guards is particularly dangerous in light of Mrs. Montgomery's trauma and history of sexual abuse at the hands of men. Defendants are well aware of this history: they know that throughout Mrs. Montgomery's childhood and adult life, men have brutalized her, abused her, raped her, and subjected her to coercive control. Because of this, Defendants are aware that transferring Mrs. Montgomery to USP Terre Haute will have the predictable result of reigniting trauma and activating defense mechanisms that will result in dissociation and psychosis. This will inevitably, predictably, and needlessly risk the health of Mrs. Montgomery, which is already extremely fragile. Defendants plan to do this at a time when Defendants know that Mrs. Montgomery should be preparing herself for her execution. Defendants know that all of these new conditions are likely to trigger dissociation, psychosis and pain and humiliation for Mrs. Montgomery. Dr. Porterfield predicts that this transport will have a devastating impact on Mrs. Montgomery in light of her history of post-traumatic stress from sexual abuse. Mrs. Montgomery is highly vulnerable to conditions that will trigger her feeling unsafe, which is very likely to lead her dissociation and potential psychosis. Dr. Porterfield concludes that the move to the male penitentiary is likely to cause Mrs. Montgomery's already poor mental state to deteriorate.

23

79.     The transfer to USP Terre Haute is also inconsistent with Defendants' policies

regarding suicidal prisoners. Defendants have concluded that Mrs. Montgomery is suicidal.

Under the BOP's Suicide Prevention Program, "No inmate who is determined to be imminently

suicidal will be transferred to another institution, except to a medical center on an emergency

basis."

## CLAIMS FOR RELIEF

## CLAIM I.
## EIGHTH AMENDMENT: CRUEL AND UNUSUAL PUNISHMENTS

80.     Government officials violate the Eighth Amendment when, acting with deliberate

indifference, they subject a prisoner to a substantial risk of serious harm or the unnecessary and

wanton infliction of pain.

81.     Defendants are aware that Mrs. Montgomery suffers from Complex PTSD,

Bipolar Disorder with psychotic features, complex partial seizures, depression, dissociative

disorder, and other mental illnesses consequent to enduring years of extreme sexual and physical

violence and emotional abuse.  Defendants are further aware that these pre-existing conditions

render Mrs. Montgomery particularly vulnerable to aggravation of her mental illness, debilitating

pain, and catastrophic psychiatric breakdown.

82.     Notwithstanding this awareness, Defendants (1) have subjected Mrs. Montgomery

to conditions of extraordinarily harshness and deprivation at FMC Carswell since October 16,

2020, and (2) plan to imminently transfer Mrs. Montgomery to the all-male USP Terre Haute,

where she will be under the surveillance and control of a mostly male prison staff.

24

83.     In carrying out these actions, Defendants have acted with deliberate indifference and have subjected Mrs. Montgomery to a substantial risk of serious harm and the unnecessary and wanton infliction of pain, in violation of the Eighth Amendment.

## CLAIM II.
## REHABILITATION ACT: DISCRIMINATION BASED ON DISABILITY

84.     Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, and the regulations promulgated thereunder prohibit discrimination against prisoners with disabilities by federal agencies, including the Department of Justice and the Bureau of Prisons.

85.     Mrs. Montgomery is a person with a disability as defined under Section 504. She experiences Complex PTSD, Bipolar Disorder with psychotic features, complex partial seizures, depression, dissociative disorder, and other physical and mental disabilities that substantially impair major life activities including thinking, concentrating, learning, and caring for herself.

86.     Mrs. Montgomery is "qualified" to participate in defendants' programs, as she is confined to defendants' custody and held in conditions and facilities against her will.

87.     Defendants have engaged in and continue to engage in unlawful discrimination against Mrs. Montgomery in violation of the Rehabilitation Act by failing to make reasonable accommodations to their policies, procedures, and/or practices concerning the confinement of death-sentenced prisoners who have received a death warrant and requiring their transfer to USP Terre Haute for purposes of execution.

88.     Defendants have failed to meet their affirmative obligations to avoid disability discrimination, instead imposing conditions of confinement and adopting plans to transfer Mrs. Montgomery to USP Terre Haute. Both such courses of action will exacerbate her disabilities, yet defendants have not considered what modifications or changes could mitigate the harm to

Mrs. Montgomery. As a result, Mrs. Montgomery is suffering more and facing greater risk because of her disabilities and Defendants' failure to make accommodations in light of these known disabilities.

89.     Mrs. Montgomery is entitled to reasonable accommodations to avoid disability discrimination, including modifications to the pre-execution protocols to limit exposure to and surveillance by unknown men; to ensure that Mrs. Montgomery can retain access to coping tools necessary to maintain stability with her disability, including but not limited to fresh air, craft materials, books, and writing tools, unless Defendants can make individualized determinations that providing such objects would constitute a direct threat; to ensure that Mrs. Montgomery can maintain consistent access to medications and known treatment provider; and to limit changes in routine and surroundings in light of the catastrophic psychological distress such changes are likely to cause as a result of Mrs. Montgomery's disabilities. Failure to make these modifications is subjecting Mrs. Montgomery to disability discrimination in violation of Section 504 of the Rehabilitation Act.

## CLAIM III.
## ADMINISTRATIVE PROCEDURE ACT: ARBITRARY OR CAPRICIOUS AGENCY ACTION; FAILURE TO FOLLOW AGENCY POLICIES

90.     The Administrative Procedure Act ("APA") prohibits agencies from taking action that is "arbitrary" or "capricious." 5 U.S.C. 706(2)(A). Agency action that is not the product of reasoned decision-making is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983). An agency must be able to "cogently explain why it has exercised its discretion in a given manner." *Id.* at 48. Agency action

that violates an agency's own rules and regulations also violates the APA, under the "*Accardi* doctrine," *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

91.     Defendants' plan to transport Mrs. Montgomery to USP Terre Haute, an all-male prison, without an adequate staffing plan or training, deviates from their own policies regarding treatment of women prisoners, including policies, law and regulations for the searches of women; required trauma and gender appropriate training for staff, and requirements for consultation. Policy 5200.02 from the BOP Female Offender Manual in part provides, "All staff at institutions or complexes housing female offenders are required to complete training developed by the Female Offender Branch and the trauma-informed correctional care module." Policy 5310.16 titled, "Treatment and Care of Inmates with Mental Illness," in part states that wardens "must provide the Mental Health Treatment Coordinator with adequate time to educate staff about the need to detect and report any unusual inmate behaviors that might suggest mental illness."

92.     Defendants' plan to transport Mrs. Montgomery to USP Terre Haute while she is imminently suicidal violates both their policies for treatment of female prisoners and the BOP's Suicide Prevention Program.

## PRAYER FOR RELIEF

Wherefore, Mrs. Montgomery requests that the Court:

1. Declare that Defendants' actions set forth herein violate Mrs. Montgomery's rights under the Eighth Amendment, Section 504 of the Rehabilitation Act of 1973, and the APA.

2. Issue preliminary and permanent injunctive relief enjoining Defendants from (1) subjecting her to the conditions of confinement at FMC Carswell described herein, and (2) transferring her to USP Terre Haute or any other all-male prison.

3. Grant final judgment in Mrs. Montgomery's favor on all claims set forth herein.

4. Grant such further relief as the Court deems just and proper.

DATED:     November 6, 2020

Respectfully submitted,

Cassandra Stubbs*
Brian Stull*
Cristina Becker
Denise LaBoeuf
ACLU Capital Punishment Project
201 W. Main St. Suite 402
Durham, NC 27705
919-682-5659
cstubbs@aclu.org
bstull@aclu.org
cbecker@aclu.org
dlaboeuf@aclu.org

David C. Fathi**
Lauren Kuhlik (D.C. Bar No. 888324779)
ACLU National Prison Project
915 15th St. N.W., 7th Floor
Washington, DC  20005
(202) 548-6603
dfathi@aclu.org
lkuhlik@aclu.org

Anjana Samant*
ACLU Women's Rights Project

125 Broad Street
New York, NY 10004
646-885-8341
asamant@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation
of the District of Columbia
915 15th Street, NW – 2nd floor
Washington, DC 20005
202-601-4266
aspitzer@acludc.org

Kelley J. Henry
Supervisory Asst. Federal Public Defender

Amy D. Harwell
Asst. Federal Public Defender
Office of the Federal Public Defender
Capital Habeas Unit
Middle District of Tennessee
810 Broadway, Suite 200
Nashville, TN 37215
TELEPHONE: (615) 736-5047
kelley_henry@fd.org

Lisa G. Nouri*
LISA G. NOURI, Mo. Bar No. 32800
2526 Holmes
Kansas City, MO 64108
(816) 875-0448
lisanouri_atty@hotmail.com

Robin Nunn
David Marvin
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3000
robin.nunn@morganlewis.com

*Pro hac vice application forthcoming
**Not admitted in DC; practice limited to
federal courts