## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**LISA MONTGOMERY**,

Plaintiff,

v.

**WIILIAM P. BARR**,
*Attorney General of the United States in his official capacity*, *et al.*,

Defendants.

Case No. 1:20-cv-03214 (TNM)

## <u>MEMORANDUM ORDER</u>

Plaintiff Lisa Montgomery strangled Bobbie Jo Stinnett to death while Stinnett was eight months pregnant and sliced her open with a kitchen knife to deliver and kidnap her premature baby. At trial, a federal jury recommended a death sentence, which the district court imposed. With her execution date looming, Montgomery now sues various federal officials—mainly to challenge the conditions of her confinement in a Texas prison and her pending transfer to an Indiana prison for execution.

Heeding the D.C. Circuit's warning that courts must carefully examine venue "to guard against the danger that a plaintiff might manufacture venue in the District of Columbia," *Cameron v. Thornburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993), the Court will transfer this case to the Northern District of Texas. That is where Montgomery is incarcerated, where the bulk of the conduct underlying her claims has taken place, and where the warden overseeing her custody resides. Not every federal execution case should be heard in this district. At its heart, this is a local matter that should be heard by a local court in Texas.

**I.**

Montgomery is incarcerated at Federal Medical Center Carswell ("FMC Carswell") near Fort Worth, in the Northern District of Texas.  Pl.'s Mem. Supp. Mot. Prelim. Inj. ("Pl.'s Mem.") at 17, ECF No. 12-1; Defs.' Resp. to Pl.'s Mem. Regarding Transfer ("Defs.' Venue Mem.") at 10, ECF No. 24.[1]  On October 16, 2020, the Government scheduled Montgomery's execution to occur on December 8 at the Federal Correctional Complex in Terre Haute, Indiana ("FCC Terre Haute").  Defs.' Resp. Opp'n to Mot. Prelim. Inj. ("Defs.' Opp'n") at 11, 14, ECF No. 23.  Her execution was re-scheduled for January 12, 2021.  Defs.' Notice, ECF No. 27.[2]  Since the announcement of her original execution date, Montgomery has been placed on "suicide watch," meaning that she is in a cell by herself with limited access to items and freedoms that she might otherwise enjoy.  *See* Pl.'s Mem. at 17–19.

On November 6, 2020, Montgomery sued Attorney General William Barr, the Federal Bureau of Prisons ("BOP"), Michael Carvajal (BOP Director), Michael Carr (Warden at FMC Carswell), T.J. Watson (Warden at FCC Terre Haute), Alix McLearen (National Administrator of Women and Special Populations Branch within BOP)—collectively, "the Government." Compl. ⁋⁋ 11–16, ECF No. 1.  Montgomery claims that the Government has violated the Eighth Amendment, the Rehabilitation Act, and the Administrative Procedure Act.  *Id.* ⁋⁋ 83, 89, 92.

A motion for injunctive relief followed ten days later.  Pl.'s Mot. Prelim. Inj. ("Pl.'s Mot."), ECF No. 12.  Montgomery seeks to enjoin the Government from (1) "continuing to subject her to the unique, harsh and unconstitutional conditions of confinement at FMC

---

[1]  All citations are to the page numbers generated by this Court's CM/ECF system.

[2]  In separate litigation in this district, the Government was enjoined from carrying out Montgomery's execution before December 31, 2020.  Order, *Montgomery v. Barr*, No. 1:20-cv-03261-RDM (D.D.C. Nov. 19, 2020), ECF No. 20.

Carswell," and (2) "transferring Mrs. Montgomery to USP Terre Haute or any other all-male prison for execution."  Pl.'s Mem. at 48.

The same day she filed her preliminary injunction motion, Montgomery moved for reassignment of her case to another judge under 28 U.S.C. § 455(a) and the Fifth Amendment's Due Process Clause.  *See* Mot. to Reassign Case ("Pl.'s Reassign Mot."), ECF No. 13. Alternatively, she asks the Court to disclose all relevant facts that bear on the question of its impartiality here.  *Id.* at 16–18.  Montgomery bases her motion on the Court's brief role as Acting Principal Deputy Assistant Attorney General ("PDAAG") in the Criminal Division of the Department of Justice ("DOJ").  *Id.* at 11–16.  The Government opposed the motion, and Montgomery replied.  *See* Defs.' Resp. Opp'n to Mot. to Reassign Case ("Defs.' Reassign Opp'n"), ECF No. 19; Pl.'s Reply Supp. Mot. to Reassign ("Pl.'s Reassign Reply"), ECF No. 26.

Meanwhile, this Court issued an order directing Montgomery to show cause as to why this case should not be transferred to the Northern District of Texas or elsewhere.  Min. Order (Nov. 18, 2020).  The venue issue has been fully briefed.  Pl.'s Mem. Resp. to Ct.'s Show Cause Order ("Pl.'s Venue Mem."), ECF No. 18; Defs.' Venue Mem.; Pl.'s Reply Resp. to Ct.'s Show Cause Order ("Pl.'s Venue Reply"), ECF No. 29.

**II.**

The Court first must consider Montgomery's motion for reassignment.  The Court served as Acting PDAAG of the DOJ's Criminal Division from March 16, 2017 through June 29, 2017.[3]

---

[3]  This position overlapped with the Court's role as Deputy Assistant Attorney General from January 20, 2017 until October 30, 2017.  *See* Pl.'s Reassign Mot. at 7; Defs.' Reassign Opp'n at 7.  In that role, the Court oversaw the Criminal Division's fraud and appellate sections.  Defs.' Reassign Opp'n at 7.  The Court also held other non-supervisory positions at the DOJ and United States Attorney's Office for the District of Columbia from fall 2007 through the early part of 2013.  Montgomery does not base her recusal request on these other positions.  In any event,

Montgomery contends that the Court's prior role as Acting PDAAG requires recusal here. She argues that the Court served in this position when the DOJ "was planning to resume executions and as Mrs. Montgomery's postconviction petition remained pending." Pl.'s Reassign Mot. at 11; *see* Pl.'s Reassign Reply at 5.

As explained below, however, Montgomery has pointed to nothing suggesting the DOJ's Criminal Division played any role in developing or advising on the execution protocol and conditions of confinement that Montgomery seeks to challenge during the time the Court was Acting PDAAG. Indeed, all the evidence points to the contrary.

Simply put, the Court's three-month tenure as Acting PDAAG—under a different Attorney General than the current one who approved the operative execution protocol and set her execution date—a decade after Montgomery received a death sentence does not support recusal under 28 U.S.C. § 455 or the Fifth Amendment's Due Process Clause.[4]

### A.

"A court has broad discretion in considering the sufficiency of a motion to recuse pursuant to 28 U.S.C. § 455." *United States v. Nixon*, 267 F. Supp. 3d 140, 146 (D.D.C. 2017). "[D]isqualification of a judge is not lightly granted." *United States v. Pollard*, 959 F.2d 1011, 1023 (D.C. Cir. 1992). And there is a "presumption against disqualification." *Nixon*, 267 F. Supp. 3d at 147 (cleaned up) (citing cases).

28 U.S.C. § 455 enumerates the circumstances that require judicial recusal. Section

---

these positions do not warrant recusal for the reasons discussed here.

[4] The Court has provided, as needed, those facts that bear on the question of recusal here. *See* Pl.'s Reassign Mot. at 16–19 (requesting disclosure of information within the Court's possession relevant to disqualification).

455(b) is specific.  It provides five scenarios that compel a judge to withdraw from a case.  *See* 28 U.S.C. § 455(b)(1)–(5).  One scenario is if the judge "served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy." *Id.* § 455(b)(3).  Section 455(a) is a general catchall provision.  It requires disqualification "in any proceeding in which [the judge's] impartiality might reasonably be questioned." *Id.* § 455(a).  The test under Section 455(a) "is an objective one, made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances." *Microsoft Corp. v. United States*, 530 U.S. 1301, 1302 (2000) (Rehnquist, C.J., Statement).

Under the Due Process Clause, the inquiry for recusal is "whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (cleaned up).[5]

## B.

The D.C. Circuit has made clear that recusal requests based on prior government service must satisfy Section 455(b)(3) "except in rare and extraordinary circumstances." *See In re Hawsawi*, 955 F.3d 152, 160 (D.C. Cir. 2020) (cleaned up); *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 471 F.3d 1355, 1358 (D.C. Cir. 2006) (Kavanaugh, J.).

Montgomery concedes that the Court's prior government experience does not support recusal under Section 455(b)(3).  *See* Pl.'s Reassign Mot. at 15 n.3.  So she must establish "rare and extraordinary circumstances" based on the Court's role as Acting PDAAG.  She has not

---

[5]  The Supreme Court articulated this standard under the Fourteenth Amendment, not the Fifth Amendment.  But the Court will apply the same standard here.  *See Jordan v. U.S. Dep't of Labor*, 308 F. Supp. 3d 24, 31 n.2 (D.D.C. 2018).

done so.  Nor has she shown that the Court's "impartiality might reasonably be questioned" under Section 455(a).

Montgomery's theory of recusal rests on the assumption that the Court either participated in, or supervised, her final appeals and the efforts to resume federal executions and addend the execution protocol.  *See* Pl.'s Reassign Mot. at 11; Pl.'s Reassign Reply at 5, 7.  But the facts show otherwise.

Indeed, one need not look further than the evidence Montgomery cites, which offers insight into how the execution protocol she seeks to challenge was developed.  *See* Pl.'s Reassign Reply at 6 (citing *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145-TSC (D.D.C.), ECF No. 39-1).  Montgomery identifies several memoranda between the BOP Director, the Deputy Attorney General's office, and the Attorney General dating back to 2017.  In these memoranda, the BOP discusses the development and implementation of the new protocol for executions in preparation for approval by the Attorney General.  The memoranda discuss the other agencies involved in these efforts.  For example, the BOP worked in consultation with the United States Marshals Service Office of General Counsel and the Drug Enforcement Administration Office of General Counsel.  Defs.' Notice of Filing of Am. Administrative R. Ex. 1 at 863–64, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145-TSC (D.D.C. Nov. 13, 2019), ECF No. 39-1.  After these consultations, the memoranda suggest the protocol was considered by various senior officials within the Deputy Attorney General's office, and was ultimately approved by Attorney General Barr.  *Id.* at 873.  The memoranda make no mention of the Criminal Division or any of its components.  None.

That makes sense.  Montgomery is correct that the "BOP is a sub-agency of the Department of Justice."  Pl.'s Reassign Reply at 7.  But the Criminal Division does not oversee

the BOP.[6]  Far from it.  The BOP is a sister component to the Criminal Division; they have different missions and reporting lines.  The BOP reports directly to the Deputy Attorney General and ultimately to the Attorney General.  Montgomery appears to acknowledge as much, claiming it was Attorney General Barr who "personally directed the Federal Bureau of Prisons (BOP) to adopt a proposed Addendum to the Federal Execution Protocol—clearing the way for the federal government to resume capital punishment."  Pl.'s Venue Mem. at 9 (cleaned up).  The Criminal Division's PDAAG does not oversee the BOP any more than a fire chief oversees a police department.[7]

Montgomery's theory also runs into a timing issue.  The Court served as Acting PDAAG for only three months in 2017.  The memoranda between the BOP and Deputy Attorney General's office are dated after this narrow window.  And the DOJ resumed federal executions and addended the execution protocol in 2019, two years after the Court left the DOJ.  *See* Pl.'s Reassign Mot. at 10 ("*After* Judge McFadden took the bench, in July of 2019, the DOJ announced that it would resume executions and that it had adopted an Addendum to the Federal Execution Protocol." (emphasis added)).  This timeline further undermines Montgomery's assumption that the Court participated in the challenged policies and procedures as Acting PDAAG.

\*        \*        \*

Against this evidence, Montgomery's reliance on the Court's supervision of the DOJ's

---

[6]  The DOJ's organizational chart is available online at https://www.justice.gov/agencies/chart.

[7]  Montgomery also suggests that the Court was "likely involve[d] in developing" the BOP Execution Manual, Female Offender Manual, and Suicide Prevention Program, all of which she seeks to challenge.  Pl.'s Reassign Mot. at 6.  Not true.  As these documents govern the BOP, the Court would have played no direct role in their formulation as Acting PDAAG.

Capital Case Section ("CCS") while Acting PDAAG is unpersuasive. *See id.* at 10, 12–14; Pl.'s

Reassign Reply at 8–9.

Montgomery identifies no specific role CCS played in her final appeals or the efforts to

resume the death penalty and addend the execution protocol. *See* Pl.'s Reassign Mot. at 7. The

DOJ's Criminal Division—and, by extension, CCS—serves primarily as a prosecutorial agency.

As Montgomery acknowledges, "the work of the CCS is primarily initiated at the pretrial

authorization phase." *Id.* at 8. It is "primarily responsible" for evaluating cases to submit to the

Attorney General for an initial death sentence recommendation. *Id.* That task as to Montgomery

ended fifteen years ago when Attorney General Gonzales authorized pursuit of the death penalty

against her. *See* Notice of Intent to Seek Death Penalty, *United States v. Montgomery*, No. 5:05-

cr-06002-GAF (W.D. Mo. Nov. 16, 2005), ECF Nos. 64, 64-1.[8] Montgomery's bare assertions

that CCS was involved in the final stages of her case or the challenged policies and protocols is

not enough. *See In re Kaminski*, 960 F.2d 1062, 1065 n.3 (D.C. Cir. 1992) (per curiam) ("A

judge should not recuse himself based upon conclusory, unsupported or tenuous allegations.").

This is especially so when all available evidence is to the contrary.[9]

Even if CCS were involved to some extent, the PDAAG's oversight of CCS is attenuated.

The PDAAG supervises six Deputy Assistant Attorneys General, one of whom supervises the

---

[8] Thus, the Court's participation in the Attorney General's Review Committee on Capital Cases
is irrelevant. *See* Pl.'s Reassign Mot. at 8. That committee reviews *new* capital cases.

[9] The circumstances here therefore differ from those that require recusal where a judge formerly
supervised attorneys who actually participated in the relevant proceeding now before that judge.
*See* Pl.'s Reassign Reply at 11 ("A recusal may be required . . . where a judge who bore
supervisory responsibility for prosecutorial activities for the Government during their career now
presides over a case which has a nexus to their supervisory role." (citing cases)). Montgomery
establishes no link between CCS and her appeals or the execution protocol and confinement
policies she seeks to challenge. So the Court's supervision of CCS does not support recusal here.

chief of CCS, who supervises the attorneys in the CCS unit. *See* Defs.' Reassign Opp'n at 8. So CCS was two-steps removed from the Court during its brief time as Acting PDAAG.

### C.

Montgomery briefly notes that, for the same reasons, the Court's participation in this case "so endangers the appearance of neutrality" that it violates her Fifth Amendment due process rights. *See* Pl.'s Reassign Mot. at 15–16 (citing *Williams*, 136 S. Ct. at 1908–09); Pl.'s Reassign Reply at 13–14. Not so.

In *Williams*, a prisoner asked the chief justice of the Pennsylvania Supreme Court to recuse himself from a case considering the prisoner's death sentence. 136 S. Ct. at 1904. The chief justice previously served as the district attorney of Philadelphia and had authorized the prisoner's death sentence. *Id.* at 1903. The Supreme Court found that the chief justice's prior authorization required recusal because it was a "significant, personal involvement in a critical trial decision" and thus "presented an unconstitutional risk of bias." *Id.* at 1907. The Court reasoned that the decision to pursue the death penalty "is a critical choice in the adversary process" and there was no question the chief justice "had a significant role in this decision." *Id.*

The facts here stand in stark contrast. As explained, the Court had no "significant, personal involvement" in any aspect of Montgomery's case, let alone a "critical trial decision." *Id.* Montgomery instead tethers together a string of assumptions based solely on the Court's position. That does not establish an "unconstitutional risk of bias." *See United States v. Norwood*, 854 F.3d 469, 472 (8th Cir. 2017) (finding no due process issue where judge as U.S. Attorney "had no significant personal involvement in a critical decision regarding [the defendant's] subsequent prosecution for mail fraud conspiracy").

\*        \*        \*

9

"[A] judge has as much an obligation *not* to recuse himself where there is no reason to do so as he does to recuse himself when proper." *In re Third Party Subpoena to Fusion GPS*, 292 F. Supp. 3d 307, 309 (D.D.C. 2018) (cleaned up). Such is the case here. The surrounding facts and circumstances do not support recusal.

At bottom, the Court served for three months in a senior DOJ position ten years after Montgomery received her death sentence. The Court had no direct role in developing or implementing the execution protocol and other policies Montgomery now challenges in this Court. Indeed, those efforts were occurring within another agency and resulted in a decision by the Attorney General after the Court had left the DOJ. Recusal is not warranted under 28 U.S.C. § 455 or the Fifth Amendment's Due Process Clause. *See In re Hawsawi*, 955 F.3d at 160 (affirming military judge's decision not to recuse based on former role as prosecutor where there was "nothing rare and extraordinary in [judge's] earlier government service" (cleaned up)).

### III.

But that is not the end of the matter. The Court next considers whether venue appropriately lies in this district. "Courts in this circuit must examine challenges to personal jurisdiction and venue carefully to guard against the danger that a plaintiff might manufacture venue in the District of Columbia. By naming high government officials as defendants, a plaintiff could bring a suit here that properly should be pursued elsewhere." *Cameron*, 983 F.2d at 256. This is such a case.

### A.

As relevant here, the transfer statute provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). To transfer a case,

a district court must determine that venue is proper in the transferee court—*i.e.*, where the case "might have been brought." *Id.* The court then weighs "a number of case-specific factors" to decide whether a transfer is warranted. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).

The D.C. Circuit has recognized several "factors that generally will be relevant to a decision whether to transfer a particular prisoner petition under 28 U.S.C. § 1404(a)." *Starnes v. McGuire*, 512 F.2d 918, 929 (D.C. Cir. 1974) (en banc). Those factors are: (1) the prisoner's difficulty in communicating with counsel, (2) the difficulty of transferring the prisoner, (3) the availability of witnesses and files, (4) where the prisoner's immediate custodian is located, and (5) the speed of final resolution. *Id.* at 929–32; *see also Pinson v. U.S. Dep't of Just.*, 74 F. Supp. 3d 283, 293 n.19 (D.D.C. 2014) (listing the *Starnes* factors).[10] Under *Starnes*, a court should also consider "whether the case involves a national policy issue that may require the testimony of policymakers." *Accurso v. Fed. Bureau of Prisons*, No. 17-cv-02626-APM, 2018 WL 4964501, at *2 (D.D.C. Oct. 15, 2018).

More, courts consider various private- and public-interest factors in all transfer cases. Private-interest factors include the parties' choices of forum, where the claim arose, the convenience of the parties and witnesses, and "the ease of access to sources of proof." *Spotts v. United States*, 562 F. Supp. 2d 46, 52 (D.D.C. 2008). Public-interest factors include the transferee court's familiarity with governing law, the relative congestion within the transferor

---

[10] The Government frames the fourth factor as "whether the complaint in fact sounds in habeas," Defs.' Venue Mem. at 11, which Montgomery contends does not apply here, Pl.'s Venue Reply at 5 n.2. Although Montgomery correctly notes that this is not a habeas action, some courts hearing non-habeas cases have phrased this factor as "the location of the plaintiff's immediate custodian." *Pinson*, 74 F. Supp. 3d at 286, 293 n.19 (considering Freedom of Information Act, Privacy Act, and *Bivens* claims). The Court considers the location of the warden relevant to cases such as this one when a plaintiff seeks injunctive relief against prison officials.

and transferee courts, and "the local interest in deciding local controversies at home." *Id.* at 52–53.

Courts do not apply these factors mechanically. "It is likely that cases will involve factors both for and against transfer," so "the District Court must determine the correct action in light of all the factors."[11] *Starnes*, 512 F.2d at 933.

### B.

To begin with, Montgomery could have brought this action in the Northern District of Texas. Where the defendants are federal agencies and officials, an action may be brought in any judicial district in which "a defendant in the action resides" or "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(e)(1). Here, at least one defendant, FMC Carswell's Warden, resides in the Northern District of Texas. *See* Defs.' Venue Mem. at 10. Significantly—and as explained below—"a substantial part of the events or omissions giving rise to" Montgomery's claims occurred in Texas.

Montgomery does not seem to contest that venue is proper in the Northern District of Texas but asserts only that venue is also proper in this district. Pl.'s Venue Mem. at 8–11. Fair enough. But the transfer statute "does not condition transfer on the initial forum's being 'wrong.'" *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 59 (2013). Rather, "it permits transfer to any district where venue is also proper," *id.*—in other words, where the action "might have been brought," 28 U.S.C. § 1404(a).

---

[11] The Government argues that the *Starnes* factors "should receive primary attention." Defs.' Venue Mem. at 11 n.4. Montgomery argues that the private- and public-interest factors, as well as the *Starnes* factors, apply. *See* Pl.'s Venue Mem. at 11, 13; Pl.'s Venue Reply at 5. The Court applies factors from both tests. *Cf. Accurso*, 2018 WL 4964501, at *2 (stating factors from both tests). Whether one test or the other exclusively applied would not change the outcome here.

## C.

### 1.

Several factors that courts consider when deciding whether to order a transfer favor the Northern District of Texas handling this case. First, Montgomery's claims mainly arose in that district—Montgomery is incarcerated there, her custodian is located there, and most facts giving rise to her claims occurred there. So the availability and convenience of witnesses from FMC Carswell, as well as the ease of access to files and sources of proof there, support transfer. Second, Montgomery's claims are inherently local in nature. She is challenging the conditions of her confinement rather than a national policy with connections to this district. Third, the difficulty and danger of transporting Montgomery to this district for any proceedings supports a transfer to the district in which she resides.

### a.

Montgomery's claims primarily arose from FMC Carswell in Texas, not Washington, D.C., because they depend on the conditions of her current confinement. Montgomery has made clear that she is *not* "seek[ing] to stop [her] execution" but rather "challeng[ing] the manner in which the Defendants are treating [her] now, and the manner in which they plan to treat her in the weeks and days leading up to her execution," Pl.'s Mem. at 10—claims that hinge on facts particular to her confinement at FMC Carswell. *See, e.g.*, *id.* at 22 (arguing that the temperature and lighting in her cell violates the Eighth Amendment), 23 (contending that suicide watch conditions have "deprived Mrs. Montgomery of basic necessities," such as sufficient hygiene products and underwear, as well as personal belongings).

Importantly, whether Montgomery is entitled to relief turns on facts that are disputed and seemingly, constantly evolving. *See* Defs.' Opp'n at 23 (stating that some of the conditions that

Montgomery challenges "are no longer in effect"), 26 ("[T]he ongoing conditions of which Montgomery complains have been imposed only recently, are temporary, are being constantly re-evaluated, and were enacted in the legitimate interest of preventing an inmate suicide."). Montgomery acknowledges that evaluating the Government's threshold exhaustion argument involves "a fact-specific inquiry that must take into account the individual prisoner's specific circumstances and conditions." Pl.'s Reply Supp. Mot. Prelim. Inj. ("Pl.'s Reply") at 15, ECF No. 31 (cleaned up). Likewise, Montgomery recognizes that "whether the accommodations [she] requests . . . are unreasonable or would impose undue burdens" is "a fact-based inquiry." *Id.* at 22 (cleaned up). The Northern District of Texas—a court close to where the alleged conditions exist, where Montgomery's requested accommodations might be made, and where relevant witnesses are located—is better situated to make crucial findings of fact.

Further factfinding may also be necessary to properly resolve Montgomery's claims. Montgomery's complaint and motion for a preliminary injunction rely heavily on a declaration filled with hearsay statements from Montgomery—a condemned prisoner with a history of dishonesty—through an attorney who has been admonished by another federal court for unprofessional conduct. *See, e.g.*, Decl. of Kelley J. Henry, Pl.'s Mot. Ex. 11, ECF No. 12-12; *see also United States v. Montgomery*, 635 F.3d 1074, 1081 (8th Cir. 2011) (tracing Montgomery's repeated and false claims of pregnancy); *Montgomery v. United States*, No. 4:12-cv-08001-GAF, slip op. at 122–28 (W.D. Mo. Mar. 3, 2017) (admonishing Henry and others for "their improper and unprofessional conduct" during Montgomery's habeas corpus proceedings). Indeed, this declaration forms the major pillar for her conditions-of-confinement allegations. *See, e.g.*, Pl.'s Mem. at 23–24. The Court is dubious that such a declaration could justify the relief Montgomery seeks. The testimony of FMC Carswell officials, or Montgomery herself,

might be needed to develop the record. *Cf. In re Chatman-Bey*, 718 F.2d 484, 488 (D.C. Cir. 1983) (vacating a transfer in part because the prisoner "raise[d] a purely legal issue, which require[d] no trial court factfinding" and would "not turn on the place at which he is incarcerated"). Thus, factors such as the availability of witnesses and files and the ease of access to proof would favor a transfer to the Northern District of Texas.

More, Montgomery asks this Court for relief aimed at officials in the Northern District of Texas—both to alleviate her current conditions and to prevent the need to transfer her to FCC Terre Haute. In her own words, "[s]he is challenging the manner in which the Defendants are treating her and intend to treat her before they execute her." Pl.'s Mem. at 48. She seeks to enjoin the Government from "continuing to subject her to the unique, harsh and unconstitutional conditions of confinement at FMC Carswell." *Id.* Montgomery suggests that the Court should temporarily enjoin her transfer "until the Court fashions an appropriate permanent remedy"— ostensibly ordering that her execution be conducted at FMC Carswell because "Carswell very likely has, or can obtain, the equipment necessary to conduct an execution." *Id.* at 48–49.

While Montgomery also challenges some potential future conditions at FCC Terre Haute, *see, e.g.*, *id.* at 26–29, the Court finds that her current conditions at FMC Carswell are the most pressing in her case. Given that the Government is enjoined from executing Montgomery before December 31, and that her execution is now scheduled for January 12, 2021, the only certain harm that Montgomery has alleged are the ongoing conditions of her confinement. *See* Pl.'s Reply at 12 (arguing that "the Defendants have *yet to determine a plan* for Mrs. Montgomery's transfer" (emphasis in original)). And those are best evaluated by a judge in the Northern District of Texas—the changing nature of the suicide watch conditions and the transfer plan means that any injunctive relief may require court involvement and monitoring. Further, in

arguing against a transfer to FCC Terre Haute, Montgomery suggests that her execution could be carried out at FMC Carswell. Whether that is in fact possible, and whether Montgomery is entitled to that relief, is best handled by the Northern District of Texas where FMC Carswell is located. If the BOP transfers Montgomery to FCC Terre Haute, the transferee court is just as equipped as this Court to handle claims related to the conditions at that facility.

**b.**

Contrary to Montgomery's assertions, this is not a case that challenges far-reaching national policies that emanate from Washington, D.C. and belongs in this district. Instead, as the above analysis shows, it is a local conditions-of-confinement case. And there is undoubtedly a "local interest in deciding local controversies at home." *Chauhan v. Napolitano*, 746 F. Supp. 2d 99, 105 (D.D.C. 2010). Reading through Montgomery's filings also reveals that her suit centers on claims *unique to her*. *See* Pl.'s Mem. at 10 (stating that Montgomery would "be the first woman executed by the federal government in almost 70 years"). Twenty-five paragraphs in her complaint are devoted to describing facts about her background that allegedly make her current conditions and her transfer to FCC Terre Haute unconstitutional. *See, e.g.*, Compl. ¶¶ 19–43 (tracing history of "Sexual Violence, Trauma, Brain Damage, and Mental Illness"), 65 ("These conditions [at FMC Carswell] will destabilize Mrs. Montgomery's mental health and exacerbate her complex and significant psychiatric and neurological conditions."), 78 ("The transfer of Mrs. Montgomery to an all-male prison . . . is particularly dangerous in light of Mrs. Montgomery's trauma and history of sexual abuse at the hands of men.").

Montgomery asserts that "the BOP's national policies and procedures animate this entire case." Pl.'s Venue Reply at 7. But that is not so. Montgomery's claims do not challenge any policy's broad effects, but rather the *implementation* (or lack thereof) of those policies *as to her*.

*Cf. Huskey v. Quinlan*, 785 F. Supp. 4, 7 (D.D.C. 1992) ("Plaintiff principally takes issue with the conduct of individuals, not with the policies underlying that conduct."). Montgomery challenges the Government's "transfer protocol," "suicide watch protocols," and "trauma-informed correctional training and gender-responsive and specific programs." Pl.'s Venue Reply at 7–8. But examining her objections to these policies reveals the crux of her claims—that the Government has violated the law in the way that they have applied these policies to her because of her unique history and needs. For example, Montgomery argues that:

- "*[n]o female prisoners have been housed there* [*i.e.*, at FCC Terre Haute] *and Mrs. Montgomery would be the only woman housed there if she is transferred*," Pl.'s Mem. at 27 (emphasis in original);

- suicide-watch conditions "are highly likely to trigger traumatic memories of Mrs. Montgomery's early experiences of sexual violence," *id.* at 24; and

- "[t]he Defendants . . . know that USP Terre Haute and its staff are neither equipped nor trained to address Mrs. Montgomery's complex, severe, and gender-specific mental health disabilities," *id.* at 31.

Although Montgomery contends that officials in this district crafted the policies at issue, Pl.'s Venue Reply at 7–8, any claim about the application of the policies turns on circumstances particular to her and "require[s] evidence from [herself] and other persons better available in" Texas, *Starnes*, 512 F.2d at 929.

That Montgomery's case does not truly focus on a national policy distinguishes it from the ones on which she relies. For example, in *Accurso*, the court declined to transfer in part because the plaintiff "challenge[d] a national BOP policy that . . . require[d] taking evidence from headquarters officials" rather than a decision that involved "the exercise of discretion by

the Warden" or "the application of policy to circumstances unique to [the] Plaintiff." 2018 WL 4964501, at *2; *see also Ravulapalli v. Napolitano*, 773 F. Supp. 2d 41, 56 (D.D.C. 2011) (declining to transfer where the "Plaintiffs' claims focus[ed] *primarily on* the policies issued from USCIS headquarters that apply to all USCIS field offices" (emphasis added)); *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 502 F. Supp. 2d 64, 66–67 (D.D.C. 2007) (explaining that the plaintiffs "challenge[d] *the validity of*" a federal regulation in several ways (emphasis added)). Although Montgomery has cited national policies and named high level officials as defendants, that is not enough to "anchor venue here." *Aftab v. Gonzalez*, 597 F. Supp. 2d 76, 81 (D.D.C. 2009).

In any event, cases claiming to be raising national policy issues are still not appropriately venued here when countervailing considerations strongly favor a transfer. Montgomery's case is like that of Arthur Small—one of the prisoners in *Starnes* who challenged the transfer of his case. *Starnes*, 512 F.2d at 922. The en banc D.C. Circuit explained that Small's argument that his case concerned national policy was "essentially based on the concept that somehow issues involving national policy are peculiarly appropriate for resolution by this forum." *Id.* at 928. The Circuit acknowledged that venue was appropriate in prior cases "where certain national policy decisions were clearly—and solely—involved," but explained that "far from creating a blanket rule that 'national policy' cases should be brought here, the decisions required [a] case-by-case determination . . . and merely noted as one factor to be considered that proof centering on national policy decisions may be peculiarly available here." *Id.* (cleaned up). It reasoned that a "case should be transferred" if "the factors favoring transfer outweigh the value of litigating the policy issue here and the preference given the plaintiff's choice of forum." *Id.* at 929. Here, as in Small's case, Montgomery "primarily raise[s] and relie[s] upon an issue that relate[s] to [her]

18

particular circumstances and that certainly, as a basis for the specific relief sought, require[s] evidence from [herself] and other persons better available in [Texas]."  *Id.*

Not all federal death penalty cases are appropriately venued here.  This is evident by comparing this case to another in this circuit in which a group of plaintiffs undoubtedly challenged a national policy that emanated from this district—the federal government's "revised protocol for execution by lethal injection" using pentobarbital.  *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 20-5329, slip op. at 2–3 (D.C. Cir. Nov. 18, 2020).[12]  In contrast, Montgomery's claims depend not on the unlawfulness of a national policy, but on how the Government has treated and will treat her specifically.

### c.

"The burdens and dangers involved in transporting a prisoner across long distances are . . . a significant inconvenience to the Bureau of Prisons and will normally justify transfer." *Starnes*, 512 F.2d at 931.  Just so here.  In the event that Montgomery is called to testify, transporting her to this district would be costly and, as the Government notes, possibly detrimental to Montgomery's mental health.  Defs.' Venue Mem. at 11–12.  To be sure, this factor, as well as some others geared towards convenience, seems less relevant today because of the frequency of telephone and video conferences due to the COVID-19 pandemic.  *But see Spotts*, 562 F. Supp. 2d at 56 (explaining that even though the plaintiff-inmates "plan[ned] to take videotape depositions," the inmates' location elsewhere still "strongly favor[ed] litigating

---

[12]  In fact, Montgomery initially sought to intervene in the *Execution Protocol Cases*, in which she would have been able to challenge a broadly applicable national policy.  *See* Mot. to Intervene, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145-TSC (D.D.C. Oct. 28, 2020), ECF No. 303.  But she later withdrew that motion.  *See* Min. Entry, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145-TSC (D.D.C. Nov. 2, 2020) (relating that Montgomery's oral motion to withdraw the motion to intervene was granted).

th[e] case there"). Even so, the Court must apply the legal framework, which envisions in-person hearings and trials, as it exists. To do otherwise would eviscerate the idea that local courts should hear local matters.

### 2.

The Court notes that some factors neither support nor weigh against a transfer. The transferee court's familiarity with governing law is neutral because federal courts are equally familiar with federal law. *See Chauhan*, 746 F. Supp. 2d at 105. Montgomery notes that the relative congestion of the courts is neutral, and the Court agrees that this consideration does not factor into the calculus. *See* Pl.'s Venue Mem. at 14. Montgomery's ability to communicate with counsel and the convenience of the parties does not seem to weigh in favor of or against transfer. As the Government points out, Montgomery's counsel are based in several places. Defs.' Venue Mem. at 11. Although at least some members of Montgomery's team are based here, Montgomery does not assert that her counsel would be unable to prosecute this action in Texas. *See* Pl.'s Venue Mem. at 12 (referring only to the convenience of potential witnesses in this district).

### D.

Montgomery's objections do not alter the Court's decision to transfer. She first questions the Court raising the venue issue sua sponte. *See id.* at 8. This is not something that the Court does routinely. But when the Court issued the show cause order, Montgomery was scheduled to be executed in 20 days.[13] Given that timeline and the urgency of both parties' interests—Montgomery's in halting alleged ongoing constitutional violations and the Government's in an

---

[13] As the Government points out, its time had not expired to move for a change in venue. Defs.' Venue Mem. at 8–9. The Court rejects Montgomery's contention that the Government filing a notice of a related case somehow conceded venue. *See* Pl.'s Venue Mem. at 12.

impending execution—the Court raised a possible venue issue early to give both parties an opportunity to respond.  *See Chatman-Bey*, 718 F.2d at 488 (recognizing that "where an inmate challenges *the conditions of his incarceration*," the district court might be justified in ordering a "*sua sponte* transfer to the place of confinement" (emphasis added)); *In re Scott*, 709 F.2d 717, 721 n.10 (D.C. Cir. 1983) (instructing district courts "to raise the [venue] question and to request responses from all interested parties" if a transfer might be appropriate).

As to Montgomery's choice of forum, while it would ordinarily be entitled to deference, less deference is appropriate if the plaintiff is not a resident of the forum, the plaintiff resides in the transferee district, and the relevant events occurred there.  *See Bourdon v. U.S. Dep't of Homeland Sec.*, 235 F. Supp. 3d 298, 305 (D.D.C. 2017).  That is the case here, as Montgomery resides in the Northern District of Texas and many of the relevant events occurred there.  This factor then "provides little if any support for maintaining venue in the District of Columbia."  *Id.*

Montgomery also contends that the delay resulting from a transfer favors keeping her case in this district.  Pl.'s Venue Mem. at 14.  True.  Both parties have an interest in the speedy resolution of this case and the Court does not take that lightly.  But this case is still very new— the preliminary injunction briefing became ripe two days ago.  The Court has sought to speed this litigation along by convening a telephonic hearing inviting the filing of a preliminary injunction motion, setting an expedited briefing schedule, and issuing a show cause order to address this venue issue.  *See* Min. Order (Nov. 12, 2020); Min. Entry (Nov. 13, 2020); Min. Order (Nov. 18, 2020).  More, the injunction preventing the Government from carrying out the execution before December 31 and the Government's newly announced execution date of January 12, 2021 provide more time to allow for a transfer.  Finally, the Court will seek to

ameliorate any delay by transferring the case at once.[14]

\*        \*        \*

Montgomery seeks to keep her case in this district by pointing to federal policies made here. There are indeed cases that belong here for that reason. But a review of Montgomery's filings makes clear that her case is not one of them. This case is about *Montgomery*—her history of trauma and mental illness, the conditions that she faces under the Government's custody, how the Government has treated (and will treat) her, and whether it has accommodated (or plans to accommodate) her unique needs. If such a case is best venued in the District of Columbia, then any federal prisoner can invoke this district's venue by citing one or more ostensibly relevant national BOP policies and suing one or more high level DOJ or BOP officials. That is not the law.

---

[14] Although *Starnes* suggested that a delay after a transfer order may be appropriate, *Starnes*, 512 F.2d at 934–35, the D.C. Circuit has since clarified that "[t]he *Starnes* rule was adopted in order to 'allow the [transferring] judge to consider any late-arriving briefs in opposition to the transfer which may have been delayed by inefficiencies in the [prison] mail services,'" *In re Asemani*, 455 F.3d 296, 300 (D.C. Cir. 2006) (alterations in original) (quoting *Starnes*, 512 F.2d at 934–35). Such concerns are not present here, as Montgomery is represented by counsel with access to electronic filing and has had two opportunities (an initial filing and a reply to the Government's response) to oppose a possible venue change.

**IV.**

For all of the reasons explained, Montgomery's motion to reassign is **DENIED** and the

case will be immediately transferred.  It is hereby **ORDERED** that the Clerk of Court shall

**TRANSFER FORTHWITH** this matter to the United States District Court for the Northern

District of Texas.  It is **FURTHER ORDERED** that the Clerk of Court close this case.

      **SO ORDERED**.


Dated:  November 25, 2020             TREVOR N. McFADDEN, U.S.D.J.