# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

LISA MONTGOMERY
Federal Medical Center Carswell
3000 I Street
Fort Worth, TX 76127,

                  Plaintiff,

     v.                                    No. 4:20-cv-01281-P

WILLIAM P. BARR
Attorney General of the United States
in his official capacity
950 Pennsylvania Avenue, NW
Washington, DC 20530,

FEDERAL BUREAU OF PRISONS
320 First St., NW
Washington, DC 20534,

MICHAEL CARVAJAL
Director, Federal Bureau of Prisons
in his official capacity
320 First St., NW
Washington, DC 20534,

MICHAEL CARR
Warden, Federal Medical Center Carswell
in his official capacity
3000 I Street
Fort Worth, TX 76127,

T.J. WATSON
Warden, Federal Correctional
Complex Terre Haute
In his official capacity
4700 Bureau Road South
Terre Haute, IN 47802

RICK WINTER
Federal Bureau of Prisons,

Regional Counsel, North Central Region
In his official capacity
Gateway Complex Tower II, 8th Floor
4th and State Avenue
Kansas City, Kansas 66101

ALIX M. McLEAREN
National Administrator of Women
and Special Populations
Federal Bureau of Prisons
in her official capacity
320 First Street, NW
Washington, DC 20534,

Defendants.

## FIRST AMENDED COMPLAINT
(for declaratory and injunctive relief—conditions of confinement)

### INTRODUCTION

1.      Plaintiff Lisa Montgomery ("Plaintiff," "Lisa" or "Mrs. Montgomery") is a federal prisoner currently housed at Federal Medical Center ("FMC") Carswell in Fort Worth, Texas. The federal government plans to execute her on January 12, 2021.

2.      Beginning in her early childhood, Mrs. Montgomery has endured severe trauma, repeated sexual and physical abuse, and neglect. These harrowing experiences, combined with congenital brain damage and multiple traumatic brain injuries, have resulted in incurable and significant psychiatric disabilities. One acute manifestation of Mrs. Montgomery's condition is extreme emotional distress, terror, and physiological stress reactions such as hives when in the presence of men, particularly strangers.

3.      The Defendants' decision to transfer Mrs. Montgomery to a men's prison in advance of her execution date, without adequate regard for her gender or her disabilities violates federal law.

2

4.      Lisa Montgomery's profound trauma began during her childhood.  She was repeatedly raped by her stepfather, who built a special room to isolate and rape her, and also gang-raped by her stepfather's friends.  Instead of protecting Lisa, her mother threatened, abused, and beat her.  Later, Lisa's mother forced her into prostitution. This sexual violence continued when, as a teen, Lisa was coerced into marrying the adult son of her mother's boyfriend, who then sexually tortured and raped her.

5.      Decades of rapes, beatings, and sexual torture have taken a devastating toll. Mrs. Montgomery has documented brain damage, experiences temporal lobe seizures, and has been diagnosed with Complex Post Traumatic Stress Disorder ("Complex PTSD") and Bipolar Disorder. Mrs. Montgomery dissociates regularly, which causes her to involuntarily detach from her environment.  FMC Carswell personnel administer her anti-psychotic, anti-epileptic, and anti-depressant medications.

6.      On Friday, October 16, 2020, Defendant Michael Carr ("Carr"), Warden of FMC Carswell, gave written notice from Defendant T.J. Watson ("Watson") to Mrs. Montgomery. The notice informed Mrs. Montgomery that the government intended to execute her on December 8, 2020.  The government later informed Mrs. Montgomery, through her counsel, that it intends to execute her at the Federal Correctional Complex ("FCC") Terre Haute, an all-male prison in Terre Haute, Indiana.  Since issuing her initial notice of execution, the government has stated that it intends to execute Mrs. Montgomery on January 12, 2021, at FCC Terre Haute.

7.      Defendants moved Mrs. Montgomery into uniquely harsh detention conditions immediately following their notice on October 16. Defendants (and/or their agents and subordinates) deprived her of all of her belongings, including books, legal papers, and photographs of her children. Defendants also transferred her to a cold, single cell with constant bright lights.

3

Male guards now observe Mrs. Montgomery while she uses the toilet in the new cell. Instead of permitting her to retain her usual clothing, they forced her to wear a loose-fitting gown with Velcro straps and took away her underwear, bra, and socks. After some days and numerous requests, Defendants provided Mrs. Montgomery with half a crayon, a single sheet of paper at a time, and socks. Effectively conceding that the Defendants had no basis to deny her underwear in the first instance, Defendants finally provided her with a pair of mesh underwear.

8. Only after Mrs. Montgomery filed this action and a request for emergency injunctive relief did the Defendants address some of her mistreatment. As Defendants know, these conditions reinforced her sexual trauma and significantly aggravated her severe mental illness.

9. Transfer to an all-male prison will inflict further gratuitous suffering on Mrs. Montgomery and will likely trigger a catastrophic psychiatric breakdown.

10. Mrs. Montgomery brings this lawsuit under the Rehabilitation Act and the Administrative Procedure Act, seeking declaratory and injunctive relief from the cruel, unusual, and discriminatory conditions of confinement that she will face in transfer to and confinement at FCC Terre Haute.

**PARTIES**

11. Plaintiff Lisa Montgomery is a U.S. citizen currently in the custody of the Federal Bureau of Prisons ("BOP"), an agency of the United States Department of Justice ("DOJ"). She is confined at FMC Carswell under sentence of death, and is scheduled to be executed on January 12, 2021. Mrs. Montgomery is a person with disabilities for purposes of Section 504 of the Rehabilitation Act.

12. Defendant William P. Barr ("Barr") is the Attorney General of the United States. Mrs. Montgomery was remanded to the custody of the Attorney General upon her conviction and

imposition of her death sentence. The Attorney General is the executive responsible for carrying out death sentences against federal prisoners. Defendant Barr is sued in his official capacity.

13.    Defendant Federal Bureau of Prisons ("BOP" or the "Bureau") is the executive agency responsible for the management and regulation of all federal penal and correctional institutions, including USP Terre Haute and FMC Carswell. The Bureau of Prisons is headquartered in Washington, D.C.

14.    Defendant Michael Carvajal ("Carvajal") is the Director of the Federal Bureau of Prisons. He is responsible for the supervision and operation of all federal prisons, including FCC Terre Haute.  Defendant Carvajal is sued in his official capacity.

15.    Defendant Carr is the warden of FMC Carswell. He is sued in his official capacity.

16.    Defendant Watson is the warden of FCC Terre Haute.  He is sued in his official capacity.

17.    Defendant Rick Winter ("Winter") is the BOP's Regional Counsel for the North Central Region, which includes FCC Terre Haute.  He is responsible for determining the conditions of Mrs. Montgomery's transfer to and confinement at FCC Terre Haute.  He is sued in his official capacity.

18.    Defendant Alix M. McLearen ("McLearan") is the National Administrator of Women and Special Populations Branch for the Federal Bureau of Prisons. She is sued in her official capacity.

**JURISDICTION AND VENUE**

19.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States. Mrs. Montgomery seeks prospective

5

injunctive relief under Section 504 of the Rehabilitation Act of 1973 and the Administrative Procedure Act, as well as declaratory relief under 28 U.S.C. § 2201(1) and 28 U.S.C. § 2202.

20.    This action was originally filed in the U.S. District Court for the District of Columbia.  This action was transferred to this District by order of Trevor McFadden, U.S.D.J., dated November 25, 2020.

## STATEMENT OF FACTS

**Mrs. Montgomery's History of Gender-based Trauma, Brain Damage, and Mental Illness[1]**

21.    Lisa Montgomery's disabilities and brain damage began before she was born.  Her mother, Judy, was an alcoholic who drank during pregnancy, causing Lisa to be born with permanent brain damage. Judy's parenting was an exercise in cruelty, neglect, and ultimately, torture.  If Lisa did not finish her meal, Judy would leave her strapped into her high chair for hours, crying.  If Lisa wet the bed, Judy forced her to take cold showers as punishment.  When Judy grew angry with Lisa, she would beat her with belts, cords, hangers, and hairbrushes. Lisa was not allowed to speak or make any noise—even the noise of a fork on a plate would trigger her mother's rage. Judy often duct-taped Lisa's mouth shut to force her into silence. Lisa learned not to cry when the duct tape was on her mouth for fear of suffocating on her own nasal mucus.

22.    Lisa's older sister, Diane, tried to protect Lisa.  But Diane was a child herself, and she was also a victim of severe abuse, including rape. When Diane was about eight years old, one of Judy's male friends began regularly molesting and raping Diane.  The man would enter Diane's room at night while she lay next to four-year-old Lisa in a bed close enough that the girls could reach out and touch each other's hands. When Diane was removed from the home by social

---

[1]  We refer to Plaintiff in this section as "Lisa" where the facts summarized concern her early life and events giving rise to crime she committed.

6

services, the state failed to remove Lisa from the home or to make any inquiries into her well-being.

23.    Lisa's father abandoned Lisa and her family when she was three years old.  Judy soon married Jack Kleiner ("Kleiner"), an alcoholic who beat his wife and her children mercilessly. Kleiner broke Judy's jaw and knocked out her teeth.  He punched, kicked, and choked Lisa.

24.    Kleiner's abuse of Lisa became sexual in nature starting when she was still a child. He would make Lisa go into the bathroom, take her pants down and bend over the tub for beatings. By the time Lisa turned 13 years old, Kleiner started raping her.  He threatened to rape Lisa's little sister if she resisted, and told Lisa that he would kill her entire family if she told anyone about the abuse.

25.    During these years, the family moved repeatedly.  In the first fourteen years of her life, Lisa moved seventeen times.   Kleiner eventually moved the family to an isolated, run-down trailer at the dead end of a road.  The trailer had no running water.  Kleiner built a small room on one side of the trailer that he used to abuse Lisa.  Lisa's small room had its own entrance from the outside, which made it easy for Kleiner to isolate and rape Lisa without interruption.  Lisa lived in constant terror of her next assault.  Although still a child, Lisa began to drink the wine stored in the room as a means to cope.  Over a period of three years, Lisa's stepfather raped her two to three times a week.

26.    Kleiner was not the only man raping Lisa, and not the only family member involved in her rapes.  When Lisa was about 15 years old, her mother began selling her for sex in exchange for utilities and other favors and services.  Judy would banish the other children from the trailer so that the plumber, the electrician, and the man who delivered propane gas could rape Lisa in private. Judy told Lisa she had to "pay" for her "own room"—the rape chamber built by Kleiner—by

submitting to the men's assaults.  At about this same time, Kleiner regularly invited his friends to the home to rape Lisa.  One after the other, several men, for several hours at a time, raped Lisa.  The men penetrated her anus, her mouth, and her vagina. When the assaults finished, the men would urinate on her Lisa like she was trash.

27.     Years later, experts concluded that Lisa's dissociative disorder began with this trauma.  Dissociative disorder is a mental illness that severs the individual's connection with reality.  That is what happened to Lisa.  To survive these attacks, Lisa would dissociate mentally to attempt to escape from her hellish reality.  She also developed Complex PTSD from the prolonged torture and abuse.

28.     The State of Oklahoma consistently failed to take steps to investigate Lisa's abuse or to protect her from violence.  Although social services removed her sister Diane from the home when Lisa was a small child, the agency failed to remove Lisa from the home or inquire into her well-being. Lisa reported the rapes to a trusted adult, her cousin David Kidwell ("Kidwell"), a police officer.  But he also failed to report the crimes or to intervene.  Kidwell later stated in an affidavit that Lisa cried and shook as she described the rapes.

29.     Lisa's mother eventually reported Kleiner's sexual assaults years after they began. When Judy was seeking a divorce from Kleiner, she took Lisa to see a local physician after Judy "discovered" Kleiner raping her.  Years later, the doctor still recalled becoming infuriated when he learned about Lisa's abuse.  Judy reported the rape to the Sperry, Oklahoma Child Welfare Office, which took no further action after noting that Judy had filed for divorce. When Judy eventually divorced Kleiner in 1985, she testified in her divorce proceedings that she saw him raping Lisa: "He was in her. He was pumping her."

30.    Unprotected by any adult or the government agencies responsible for ensuring her safety, Lisa survived through involuntary coping mechanisms.  She retreated into her own internal world.  Occasionally, she would enjoy her violin or play with her childhood dog. But Judy soon took these simple joys from Lisa too.  She took Lisa's violin away and sold it. Judy killed the family dog in front of children by brutally smashing its head with a shovel until the dog's brains spilled out.

31.    Lisa also suffered multiple head injuries in her early developmental years at the hands of her mother, stepfather, and stepbrother.  Lisa's mother and stepfather slapped, shook, and hit her frequently. When Lisa was a teenager, her stepfather, Kleiner, hit her head against the concrete floor while he raped her.  One of Lisa's stepbrothers threw a heavy battery at Lisa and injured her in the back of her head.

32.    When Lisa was in high school, her mother became involved with a new boyfriend, Richard Boman ("Boman").  When Judy spent time with him, she left Lisa to cook and clean, and to care for Lisa's younger siblings.  Lisa made plans to escape.  She signed up for the Air Force and prepared to enlist immediately after high school graduation.  But when Boman's twenty-four-year-old son, Carl, came home from the Army, Judy and Boman coerced Lisa into marrying him, even though she was a minor and Carl was effectively her stepbrother. Lisa quickly became pregnant and lost her chance to enlist and to free herself from her traumatic environment.

33.    By the eve of her eighteenth birthday, Lisa had experienced nine out of the ten major adverse childhood experiences that medical experts have identified as leading to trauma and mental illness.  This is a devastating amount of trauma for one person to endure.  It impaired every sphere of Lisa's existence.  Lisa's home environment made it impossible for her to develop into a functioning adult.  For Lisa, skills like regulating her feelings, planning, thinking through her

actions, and controlling her impulses were difficult at the best of times. Under stress, they were nearly impossible. Decades later, doctors found that the damage from Lisa's childhood was visually apparent in her anatomy. Medical imaging revealed that Lisa is missing brain matter, proving that her brain had either deteriorated after an injury or that it never developed properly.

34.    Lisa's upbringing stripped her of any autonomy and sense of self. She had been raised in captivity, deprived of any control over her body and mind, and placed at the mercy of people who tortured her sexually, physically, and emotionally. She learned to survive by doing what her captors demanded.

35.    Lisa also developed Complex PTSD, which causes her to re-experience her torture as if it were actually occurring at the present moment. The constant feeling of living under threat overwhelms Lisa. As one mental health expert observed, "[t]here [was] no ground for her to stand on."

36.    Violence followed Lisa in all her relationships. Carl Boman, her stepbrother and first husband, controlled everything in Lisa's life. He also raped and brutalized her. In one incident, as Lisa was naked and getting out of the shower, Carl shoved her against a wall heater that burned her flesh while he raped her. Carl's behavior only became more violent during their marriage. He beat her, tied her in stress positions, poured hot wax on her, forcibly inserted glass bottles in her anus and vagina, held a knife to her throat, and raped her. Lisa was ashamed, humiliated, and fearful. She grew to expect the violence and lived in sickening anticipation of its recurrence. Lisa would dissociate and escape mentally during the rapes, just as she did when she was raped as a young child. Years later, Lisa's half-brother Teddy Kleiner accidentally discovered a home video showing Carl beating and raping her. Teddy described it "like a scene out of a horror video. My sister was crying and in pain."

37.    Lisa gave birth to Carl's four children in less than five years. After her fourth child was born, Carl and Judy, Lisa's mother, forced Lisa to be sterilized.

38.    After the birth of her children, Lisa's mental health deteriorated even further. Her psychotic symptoms intensified. She descended into a near constant state of dissociation and depersonalization. She also experienced the full onset of Bipolar Disorder after the birth of her four children. Her moods became erratic and swung dramatically. She experienced rapidly shifting feelings of irritability, agitation, and depression, sometimes all at once. Her Complex PTSD exacerbated her Bipolar Disorder symptoms. These complex, layered disabilities and impairments made it difficult for Lisa to concentrate and left her feeling confused by the world around her.

39.    Entering adulthood, Lisa increasingly turned to alcohol. By the time she was in her twenties, she was often drunk. She stopped taking care of her personal appearance and hygiene to such an extent that people could not stand to be around her. She had lice for five years, seemingly unaware or indifferent. Lisa was not able to keep up with the day-to-day tasks of parenting. Her children went to the neighbors for food and baths. Lisa had spiraled so far down into mental illness that she responded to her children only when they called her by an imaginary name, "Martha." Removing lice from her children's hair so overwhelmed Lisa that instead of addressing it, she withdrew them from school.

40.    The crime for which Lisa Montgomery was convicted and sentenced to death reflects the depth of her mental illness, despair, and disconnect from reality. The crime also occurred against the backdrop of changes in her family setting that amplified these conditions. Lisa and Carl had divorced, and Carl was fighting for custody of their children. Meanwhile, Lisa had remarried, to Kevin Montgomery. The crime took place two days after Carl officially filed for custody of their children, and after Lisa told her new husband she believed she was pregnant

(which was impossible, because she had been sterilized against her will). Carl learned that Lisa had told her new husband she was pregnant, and he threatened to expose her sterilization in court in order to obtain custody of her children. The threat of losing her children, combined with years of trauma and severe mental illness, pushed Lisa over the brink. She went to the home of Bobbie Jo Stinnett, who was eight months pregnant. Lisa killed her, delivered her baby girl by cutting her from her mother's abdomen, and took the baby home and cared for her, believing she was her own child.

41.    All experts—even those called by the prosecution at trial—agree that Lisa Montgomery was suffering from severe mental illness at the time of the crime. Yet she received no mental health treatment and no regular medical care either then or at any other time during her decades of torture. By her mid-twenties, Lisa Montgomery was emotionally, physically, neurologically and psychologically broken. The years of constant abuse, combined with brain damage, deprived Mrs. Montgomery of the most basic conditions required for normal human functioning.

42.    Brain imaging and testing show that Mrs. Montgomery's brain's networks are severely damaged. A neurologist compared her brain to a city that has been bombed in multiple areas, resulting in impaired functioning across the entire city. Her neurological impairments have profound practical impacts. In lay terms, for example, the parietal lobe synthesizes information and stimuli and helps a person decipher what is good or bad for her, and damage to the parietal lobe impairs this function.

43.    In addition to brain damage, Mrs. Montgomery has developed significant psychological impairments and psychiatric conditions that are well-documented in her prison medical records. She has multiple, serious mental health diagnoses: Complex PTSD, Bipolar

Disorder with psychotic features, and Major Depression. She also has Temporal Lobe Epilepsy. Mrs. Montgomery's Complex PTSD can be expected to aggravate the symptoms of her Bipolar and Depressive Disorders. She experiences depressed thinking, mood instability, behavioral dysregulation, anxiety, shame, fear, paranoia, hallucinations, and dissociation. She has auditory hallucinations that her mother is talking to her and saying cruel things. She experiences olfactory hallucinations of a "bad smell" that others cannot detect. Mrs. Montgomery becomes easily overwhelmed, and is erratic and unable to manage her emotions. She has a disturbed sense of self, and distorted interpersonal relationships as a result of her childhood experience of relationships as threatening and unstable. Mrs. Montgomery re-experiences intrusive images of her stepfather's rapes that result in hyperarousal symptoms of heart racing, fear, and gagging. In any given moment, she may once again endure the same smells, sensations, and physiological responses that she experienced when raped repeatedly as a child and young woman.

44.    Dissociation remains by far Mrs. Montgomery's most prominent symptom. Dissociation disconnects thoughts, memories, surroundings, and identity. People with dissociative disorders escape reality in ways that are involuntary and maladaptive and impair functioning in everyday life. She has confused thought processes and thinking, and disengages from the present. Her own perceptions of her body slip away from her. She is unable to recognize the world around her as real, and has repeatedly lost contact with reality. At its most severe phase, dissociation will rupture the link between consciousness and awareness. Significant stress is one factor that pushes individuals like Mrs. Montgomery with dissociative disorder past this breaking point.

45.    Mrs. Montgomery's Dissociative Disorder, Bipolar Disorder, Temporal Lobe Epilepsy, traumatic brain injuries, and brain damage from in utero alcohol exposure are not curable. Medication, psychotherapy, and developing coping skills can help some individuals more

successfully navigate daily living.   Prison doctors administer a host of antipsychotic, antidepressant, mood-stabilizing, and seizure medications to Mrs. Montgomery, including Risperdal, Depakote, Wellbutrin, Zoloft, Elavil, and Lithium.   She also participates in psychotherapy and coping activities like crafts and reading.  But all of these things have had only a limited impact on her most serious symptoms like psychosis.  She has attempted suicide multiple times, including in 2010, 2011, and 2012, with overdoses of aspirin or Tylenol.  She has been periodically suicidal in recent years and is currently on suicide watch.  Her care level classification is currently 3-MH, which is the most serious mental health classification for patients housed at Carswell.  *See* Fed. Bureau of Prisons, Clinical Guidance, *Care Level Classification for Medical and Mental Health Conditions or Disabilities*, at 14 (May 2019), www.bop.gov/resources/pdfs/care_level_ classification_ guide.pdf.  This classification is reserved for patients with severe mental illness.  With increased stress, her always tenuous link to reality is even more susceptible to rupture.

**Transferring Mrs. Montgomery to FCC Terre Haute Will Further Aggravate Her Severe Mental Illness and Violate BOP's Own Policies**

46.    FMC Carswell is an administrative security federal medical center with an adjacent minimum-security satellite camp, housing 1,066 women of all security levels with special medical and mental health needs in the medical center and 239 women at the camp.

47.    FMC Carswell is the only medical facility for women in the Federal Bureau of Prisons.

48.    In contrast, FCC Terre Haute is an all-male prison, housing approximately 1,241 high- and medium-security prisoners, with an adjacent all-male prison camp housing approximately 198 minimum-security prisoners.  No female prisoners have ever been housed at FCC Terre Haute.

49.     Federal regulations do not specifically designate the BOP facility at which federal executions shall be carried out, but instead require the Director of the BOP to make that designation. *See* 28 CFR § 26.3. In 1993, the Director of the BOP designated FCC Terre Haute. At that time, there were no women on death row. The Defendants have not designated any prison as the location where women facing the death penalty shall be executed.

50.     Hundreds of male guards work at FCC Terre Haute. Male prisoners and staff perform the work of the prison, like preparing meals, cleaning the prison facilities, and doing laundry. Defendants' planned transfer of Mrs. Montgomery will mean she will be watched over by an armed force that is predominantly male and that has little or no experience working with female prisoners.

51.     Defendants are aware of the special risks posed by having guards without appropriate training supervise women with histories of trauma. On November 23, 2016, Defendant BOP adopted the Female Offender Manual (the "Manual") with the purpose of ensuring that the BOP's activities are "gender-responsive, culturally sensitive and address the unique needs of incarcerated females at facilities that house female offenders." The Manual specifies that gender-responsive approaches are "based on an understanding of the ways females are different from men," and "trauma-informed approaches recognize the experiences and outcomes of all types of trauma and take steps to address them through policy and programs." A 2018 Report of the Office of the Inspector General, *Review of the Federal Bureau of Prisons' Management of Its Female Inmate Population*, noted that the BOP developed the Manual based in part of studies that show that "as many as 90 percent of women in prison have experienced trauma and that the most common type of traumatic experience for female inmates is repeated sexual violence, followed by

intimate partner violence." The BOP is aware that, in light of this trauma, its policies must adopt and implement training to ensure the psychological and emotional safety of female prisoners.

52.     The Manual requires that "[a]ll staff at institutions or complexes housing female offenders are required to complete training developed by the Female Offender Branch and the trauma-informed correctional care module." It recognizes the special need for training and services for "female satellite facilities attached to male institutions." Additionally, a host of binding federal regulations require that female prisoners be searched only by female BOP employees. *See* 28 C.F.R. § 552.11(c); BOP Program Statement 5521.06, Searches of Housing Units, Inmates, and Inmate Work Areas, 4 (June 4, 2015); *see also* 28 C.F.R. § 115.15(a)-(b); BOP Program Statement 5521.06, 3; BOP Program Statement 5324.12, Sexually Abusive Behavior Prevention and Intervention Program, 17 (June 4, 2015).

53.     The Manual permits female prisoners to be housed in administrative units like the FMC Carswell unit, but requires that those prisoners must receive "mental health screening." The Manual contains the following BOP policy:  if "an inmate's mental health appears to have deteriorated during placement in the administrative unit, the institution's Chief Psychologist works with the Female Offender Branch and Psychologist Services Branch to mitigate the impact or to identify an alternative placement." In addition, the Manual's Policy 5310.16 titled, "Treatment and Care of Inmates with Mental Illness," states that wardens "must provide the Mental Health Treatment Coordinator with adequate time to educate staff about the need to detect and report any unusual inmate behaviors that might suggest mental illness."

54.     On November 1, 2020, Mrs. Montgomery's counsel submitted detailed questions to counsel for Defendant BOP about the Defendants' proposed protocols, if any, for transferring Mrs. Montgomery to FCC Terre Haute and the expected conditions of her confinement there. Mrs.

Montgomery's counsel requested information about the gender composition of the transport team, and whether any of the individuals involved in transporting Mrs. Montgomery are trained in gender responsive, trauma-informed correctional practices. On November 6, 2020, the Defendants declined to answer any questions regarding Mrs. Montgomery's transfer. The Defendants merely stated that it is the BOP's general policy to supervise female prisoners in accordance with the Manual.

55.   The Defendants have failed to address the challenged conditions of Mrs. Montgomery's transfer to and confinement at FCC Terre Haute.

56.   Defendants have submitted a declaration in this action from Defendant Winter confirming that Defendants have not put in place adequate plans concerning Mrs. Montgomery's transfer to and confinement at FCC Terre Haute. *See* Dkt. 23-3 ("Winter Declaration"). The Winter Declaration is riddled with holes and hedges. It concedes that Defendants have *yet to determine a plan* for Mrs. Montgomery's transfer: "The BOP currently is considering several different options to transport Ms. Montgomery . . . but the final plan is yet to be determined." Defendants speculate that they may decide to transport her one to two days before her execution, but acknowledge that those are only the "current options being considered." *Id*. The Winter Declaration also states that "the plan" is that Mrs. Montgomery will not be housed with male prisoners "absent extraordinary circumstances," but does not say what those "circumstances" are and purports to reserve to the Defendants the discretion to make that determination (despite the fact that FCC Terre Haute does not contain "female satellite facilities attached to male institutions" that the Manual requires.). The Winter Declaration confirms that the Defendants have not determined whether other law enforcement agencies will participate in Mrs. Montgomery's transport, and have not disclosed how many people may be involved.

57.     Despite Defendants' knowledge of Mrs. Montgomery's suicidal state, and requests from her counsel, the Defendants have refused to confirm whether the BOP team responsible for transporting Mrs. Montgomery to FCC Terre Haute will include any individuals trained in gender-responsive, trauma-informed correctional practices. This training is critical to protect Mrs. Montgomery from being re-traumatized in light of her documented history of sexual and physical abuse.  Defendants have likewise refused to guarantee that the transport team will include any female guards.

58.     Defendants have had *years* to plan Mrs. Montgomery's execution and to develop protocols ensuring that they do not treat her, in the days leading to her execution, in a manner antithetical to human dignity.

59.     If Mrs. Montgomery is transferred to FCC Terre Haute, she will face immediate and serious harm.  The Defendants themselves have determined that Mrs. Montgomery is presently suicidal.  Nevertheless, they plan to transport Mrs. Montgomery to FCC Terre Haute while she is on "suicide watch," in violation of the BOP's Suicide Prevention Program, which prohibits the transfer of an imminently suicidal prisoners, except to a medical center (which USP Terre Haute is not).  *See* Program Statement P 5324.08 ("No inmate who is determined to be imminently suicidal will be transferred to another institution, except to a medical center on an emergency basis.").

60.     The trauma and harm to Mrs. Montgomery will last well beyond the transfer itself. FCC Terre Haute is an all-male prison. No female prisoners have ever been housed there and Mrs. Montgomery would be the only woman housed there if she is transferred.

61.     At FCC Terre Haute, Mrs. Montgomery will be required to interact with a large number of armed, male guards.  Whenever prisoners on death row are moved outside of their cells,

they are handcuffed and shackled in leg irons and a waist chain, and are accompanied by multiple armed guards.  For each of the eight executions carried out the BOP in 2020, an all-male escort team of heavily armed guards transported the death-sentenced prisoner from his cell into a vehicle, and then into another building in which the execution takes place (the "Death House"). Hundreds of additional BOP and law enforcement personnel, including many in full body armor with military-style weapons, patrolled the grounds of FCC Terre Haute on the day of the execution and in the preceding days.  In addition to the escort team, heavily armed male guards line and patrol the hallways of the Death House—the very location where the Defendants now claim they will house Mrs. Montgomery.

62.     While Mrs. Montgomery's armed escorts at FMC Carswell have included at least some women, the armed guards that have transported death row prisoners at FCC Terre Haute have been all male, dressed in body armor and helmets, and carrying military weapons.

63.     The Defendants have given no assurances that the guards transporting Mrs. Montgomery to, or those at FCC Terre Haute, are trained to supervise female prisoners with severe mental illness and a history of sexual abuse.  Upon information and belief, none of the medical staff at FCC Terre Haute is trained to meet the particular needs of female prisoners.  This lack of training is contrary to the BOP's own written policies and standards, which require that staff must complete specific trauma-informed training regarding the treatment and oversight of female prisoners.

64.     The BOP's policies and practices concerning FCC Terre Haute—which allow male prisoners to perform sanitation duties where prisoners are housed, and exclude female items such as brassieres from the list of allowable prisoner personal property—further demonstrate that the facility is not appropriate for the confinement of a lone female prisoner with severe mental illness.

65.    Because FCC Terre Haute is an all-male facility, and *not* a Federal Medical Center, Mrs. Montgomery will be denied access to mental health professionals who have experience treating female victims of sexual assault.

66.    The Defendants' decision to transfer Mrs. Montgomery, already suicidal, to an all-male prison, where she will be supervised by guards without any of the gender-specific training that federal regulations require, is particularly dangerous in light of Mrs. Montgomery's trauma and history of sexual abuse at the hands of men.  The Defendants are well aware of this history. They know that throughout Mrs. Montgomery's childhood and adult life, men have brutalized her, abused her, raped her, and subjected her to coercive control.  Because of this, the Defendants are aware that transferring Mrs. Montgomery to the all-male FCC Terre Haute will have the predictable result of reigniting trauma and triggering dissociation, psychosis and further pain and humiliation for Mrs. Montgomery, and will cause her already debilitated mental state and health to deteriorate further. The Defendants' actions will inevitably, predictably, and needlessly cause serious harm to Mrs. Montgomery's health.

## CLAIMS FOR RELIEF

### CLAIM I.
### REHABILITATION ACT: DISCRIMINATION BASED ON DISABILITY

67.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the regulations promulgated thereunder prohibit discrimination against persons with disabilities by federal agencies, including the Department of Justice and the Bureau of Prisons.

68.    Mrs. Montgomery is a person with a disability as defined under Section 504. She experiences Complex PTSD, Bipolar Disorder with psychotic features, complex partial seizures, depression, dissociative disorder, and other physical and mental disabilities that substantially impair major life activities including thinking, concentrating, learning, and caring for herself.

20

69.     Mrs. Montgomery is "qualified" to participate in the Defendants' programs, as she is confined to the Defendants' custody and held in their facilities against her will.

70.     The Defendants have engaged in and continue to engage in unlawful discrimination against Mrs. Montgomery in violation of the Rehabilitation Act by failing to make reasonable accommodations to their policies, procedures, and/or practices concerning the confinement of death-sentenced prisoners who have received a death warrant and requiring their transfer to FCC Terre Haute for purposes of execution.

71.     The Defendants have failed to meet their affirmative obligations to avoid disability discrimination as a result of their decision to transfer Mrs. Montgomery to FCC Terre Haute. The Defendants have not implemented modifications or changes that would mitigate the harm to Mrs. Montgomery. The Defendants' failure to reasonably accommodate Mrs. Montgomery's known disabilities has caused her to suffer and face greater risk of harm.

72.     To avoid disability discrimination, Mrs. Montgomery is entitled to reasonable accommodations, the most significant of which is simply to not transfer her to a men's prison and instead conduct her execution at FMC Carswell, a prison for women with staff trained to deal with mentally ill and long-traumatized women prisoners. The Defendants know that transferring a woman who is mentally ill—*because* of years of abuse at the hands of men—to an all-male maximum security prison, where she will be surrounded male prisoners and constantly surveilled by male guards without the required training or experience with respect to female prisoners, will have a foreseeable and catastrophic impact on Mrs. Montgomery because of her disability, whereas other prisoners with a death warrant are housed in a gender-consistent facility that will avoid exacerbating any mental illness related to violence by the opposite gender. Other accommodations include modifications to the Defendants' pre-execution protocols to limit exposure to and

surveillance by unknown men and to ensure that Mrs. Montgomery can retain access to coping tools necessary to maintain stability with her disability.  Failure to make these modifications is subjecting Mrs. Montgomery to disability discrimination in violation of Section 504 of the Rehabilitation Act.

## CLAIM II.

## ADMINISTRATIVE PROCEDURE ACT: ARBITRARY OR CAPRICIOUS AGENCY ACTION; FAILURE TO FOLLOW AGENCY POLICIES

73.     The Administrative Procedure Act ("APA") prohibits agencies from taking action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).  Generally, BOP action regarding a federal prisoner's place of imprisonment, and transfer to other federal facilities, is exempt from challenge under the APA.  *See* 18 U.S.C. § 3625.  "Federal judicial review does remain available, however, for allegations that BOP action is contrary to established federal law, violates the United States Constitution, or exceeds its statutory authority."  *Slice v. Tews*, No. 10-0838, 2011 WL 6091089, at *2 (N.D. Cal. Dec. 6, 2011).

74.     When a federal agency refuses to follow its own policies and programs, it commits a Due Process violation.  Here, the Defendants' decision to transport and confine Mrs. Montgomery to FCC Terre Haute, an all-male prison, without an adequate staffing or training plan, deviates from their own policies regarding the treatment and oversight of female prisoners and prisoners with mental illness, including policies, law and regulations for the searches of women; required trauma and gender appropriate training for staff.  Such training is necessary for all staff at any facility where female prisoners are housed to ensure that they are not re-traumatized, to preserve the safety and security of the prisoners and staff, and to ensure that correctional staff do not mistake behaviors that are responses to trauma as disobedience.  Yet, because they do not work

at a facility that houses female prisoners, staff at FCC Terre Haute have not completed such gender-specific, trauma-informed correctional training.

75.     Additionally, the Defendants' plan to transport Mrs. Montgomery to FCC Terre Haute, which is not a medical center, while she is on "suicide watch" violates the BOP's own policies and programs.

76.     The Defendants failure to follow the BOP's own policies and programs has violated Mrs. Montgomery's Due Process rights.   That, of course, is a constitutional violation subject to review under the APA.  *Sacora v. Thomas*, 648 F. Supp. 2d 1218, 1221 (D. Or. 2009).

## PRAYER FOR RELIEF

Wherefore, Mrs. Montgomery requests that the Court:

1. Declare that Defendants' actions set forth herein violate Mrs. Montgomery's rights under Section 504 of the Rehabilitation Act of 1973 and the APA.

2. Issue preliminary and permanent injunctive relief enjoining Defendants from transferring her to FCC Terre Haute or to any other all-male prison.

3. Grant final judgment in Mrs. Montgomery's favor on all claims set forth herein.

4. Grant such further relief as the Court deems just and proper.

Dated:  December 3, 2020

Respectfully submitted,

By: */s/ Robin Nunn*
Robin Nunn (admitted pro hac vice)
robin.nunn@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: (202) 739-3000
F: (202) 739-3001

Brian W. Stull*
ACLU Capital Punishment Project
201 W. Main Street, Suite 402
Durham, NC 27701
T: (919) 682-5659
bstull@aclu.org

Anjana Samant*
ACLU Women's Rights Project
125 Broad Street
New York, NY 10004
T: (646) 885-8341
asamant@aclu.org

*pro hac vice motion forthcoming

***Counsel for Lisa Montgomery***

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served upon all parties receiving ECF service in this case on December 3, 2020.  Service of this Amended Complaint and Summons for Defendant Rick Winter, newly named in this pleading, will be made in accordance with the Federal Rules of Civil Procedure.

*/s/ Robin Nunn*
Robin Nunn

24